IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 12, 2000 Session

## STATE OF TENNESSEE v. ORLANDO CRENSHAW

**Appeal from the Circuit Court for Lawrence County**
**No. 20944      Stella L. Hargrove, Judge**

---

**No. M2000-01459-CCA-R3-CD - Filed June 1, 2001**

---

The defendant challenges his conviction for attempted first degree murder, contending that the evidence was insufficient, the trial court should have granted a change of venue due to pervasive pretrial publicity, the trial court should have accepted the jury's statement that it could not return a unanimous verdict after it revealed its numerical division, and the jury was tainted by extraneous information. We affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Richard McGee, Nashville, Tennessee, for the appellant, Orlando Crenshaw.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General; T. Michael Bottoms, District Attorney General; Robert C. Sanders, Assistant District Attorney General; and James G. White, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Orlando Crenshaw, appeals as of right his conviction by a jury in the Lawrence County Circuit Court for criminal responsibility for attempted first degree murder, a Class A felony. The trial court sentenced him to twenty-five years in the Department of Correction as a Range I, standard offender and imposed a forty-thousand-dollar fine. The defendant contends that:

(1) the evidence is insufficient to support his conviction;

(2) the trial court erroneously denied his motion for a change of venue;

(3) the trial court should have accepted the jury's announcement that it could not reach a unanimous verdict; and

(4) the jury was influenced by extraneous information.

Discerning no harmful error, we affirm the trial court's judgment of conviction.

This case arises out of the September 1998 shooting and beating of Angelo Wilson, a confidential drug informant. At trial, the thirty-one-year-old victim testified as follows: In September 1998, he earned extra money by working as a confidential drug informant for Lawrence County and Lawrenceburg City law enforcement agencies. In the course of this employment, he bought drugs from the defendant, whom he knew, and these purchases were recorded on audiotape and videotape. He had known the defendant's family for years and came across the defendant's aunt, Letha Davis, during his undercover work. The state brought charges against the defendant as a result of these drug transactions, and the defendant received some of the recordings of the drug purchases through discovery. In the summer of 1998, the victim was drinking beer with the defendant at the American Legion Club when the defendant said that if anyone "jam him up," he would have that person killed or he would do it. He said that David Hogues and Ernest Bumpus were present when the defendant said this. Later, someone delivered a copy of an audiotape featuring the victim buying drugs from the defendant to the house that the victim shared with his mother, Mary Wilson.

The victim testified that the afternoon of September 9, 1998, he visited his brothers on Fifth Street where he saw his friend Butch Osepczuk, whom he had known since childhood. He walked with Osepczuk to the Traveler's Motel, where Osepczuk was staying, and they talked for a while. The victim was scheduled to work the 11:00 p.m. to 7:00 a.m. shift that night, and he asked Osepczuk for a ride to work. Osepczuk called a friend with a car, and not long after dark, Terry Polidoro arrived in a silver, four-door Mercury. Osepczuk and Polidoro agreed to take the victim to work after they made a few stops. After stopping by a bridge and at a store, they said that they had to make a deal with someone and asked the victim to wait beside the road because they did not want him to see whom they were meeting.

The victim testified that Polidoro and Osepczuk returned a short time later and that Osepczuk said, "Come on. Let's go. We're ready." As he approached the car, Osepczuk started shooting, and a bullet struck his right leg near his hip. He heard more shots fired as he ran into a bean field. He fell, and Polidoro and Osepczuk began fighting and struggling with him. Polidoro held him while Osepczuk hit his head with the gun. Polidoro swung a board at him and then held him again while Osepczuk continued to hit him on the head. During the attack, he asked Osepczuk why he was doing this, and Osepczuk replied, "You're dead." Eventually, the victim stopped struggling and pretended to be dead. Polidoro told Osepczuk to stop because the victim was dead and that they should go. The victim heard two car doors slam and the car leave. He then walked to the closest house where the residents helped him.

-2-

The victim testified that he was flown to Vanderbilt Hospital where he remained for two to three days. He had been shot seven times and struck with a gun and a board from the nape of his neck to the front of his head. His head injuries required over one hundred staples. The victim had not conducted any undercover work related to Osepczuk or Polidoro and knew of nothing that would have provoked the shooting and beating. He admitted that he had used cocaine and marijuana on his birthday which was a couple of days before the attack.

Special Agent Wayne Wesson of the Tennessee Bureau of Investigation (TBI) testified as follows: On September 10, 1998, he assisted Investigators Foriest and Dickey from the Sheriff's Department in the investigation of the September 9 shooting and beating of the victim. He found five .45 caliber shell casings in the road at the crime scene. He located a three to five foot trail into the bean field which widened after twenty or thirty yards. The beans were trampled down in this area, which contained spots of blood. Three smaller trails led from the widened area to the road. He found the victim's keys, sunglasses, and shirt in the bean field. He found a piece of another shirt, containing a pack of Marlboro cigarettes, which he later learned belonged to Osepczuk. He also found a piece of a two by four board which appeared to have been sharpened on one end and had blood on it. A search of Osepczuk's motel room revealed a .45 caliber bullet. Agent Wesson returned to the bean field a day or two later with Polidoro. After talking with Polidoro, he went to nearby Trip Road where he found another piece of Osepczuk's shirt and Polidoro's shirt. On September 15, he took a statement from the victim. The statement was entered into evidence and is substantially similar to the victim's trial testimony.

Agent Wesson testified that telephone records revealed that on September 9, several calls were made between the Traveler's Motel and the Park View Motel, where Polidoro was staying. At 10:31 p.m. on September 9, someone at the Traveler's Motel called the apartment of Letha Davis, the defendant's aunt. Around midnight on the ninth, calls originating from the Park View Motel were made to Ms. Davis's apartment. At 12:13 p.m. on September 10, a call was made from the home of Genevive Smith to the defendant's home. The police arrested Osepczuk at Ms. Smith's home around 2:30 p.m. Agent Wesson admitted that Osepczuk had no money when arrested and that the police found no money in Osepczuk's motel room. The police arrested Polidoro on September 11 and searched his room. They found no money in his room or on his person.

Jennie V. Douglas testified as follows: The day after the victim was shot, Osepczuk came to her house. After he used her telephone, the defendant came to her house. The defendant and Osepczuk spoke in the kitchen, but she did not hear the conversation. Osepczuk did not have a gun, and she did not see him give anything to the defendant. She did not see the defendant with any money. After the defendant left, the police came and arrested Osepczuk.

Daniel Freemon, an attorney, testified as follows: He represented the defendant in some pending charges. In 1998, he filed a motion for discovery, and on May 27, 1998, he received audiotapes and videotapes in response to this motion. His paralegal gave the tapes to the defendant on June 3, 1998, and the defendant returned them on June 4, 1998. Mr. Freemon later reviewed the recordings and identified the victim on a portion of one of them.

Stephen R. Perry testified as follows: He was acquainted with the defendant, and Osepczuk is his stepson. In March or April 1998, he met the defendant and "Boo" Hassell at a drug store in Lawrenceburg. He approached the defendant, who was in his car, and asked about buying some crack cocaine. The defendant said that he was no longer in that business because of an audiotape of someone from the police buying crack cocaine from him. The defendant said that he got the audiotape from his lawyer and that the tape contained the victim and Peter Owens buying drugs from him. The defendant feared prosecution for selling drugs and did not want to go to jail. The defendant asked Mr. Perry if he knew someone who could help him take care of the victim and Mr. Owens. Mr. Perry told the defendant that he did not know anyone and that he would not do it. Mr. Perry admitted that after this conversation, he and Mr. Hassell sold some of Mr. Hassell's pills and that Mr. Hassell bought some crack cocaine. Mr. Perry used crack cocaine that day and had been using it for a while. Three or four days after talking with the defendant, Mr. Perry told a police officer about the conversation. Despite his frequent contact with law enforcement and prosecutors stemming from his job as a bounty hunter, he did not mention the conversation again until after his stepson, Osepczuk, had been arrested and charged with attempted murder.

Gary Claude White testified as follows: He painted part of the defendant's house in March or June of 1998. The defendant offered him ten thousand dollars to "do [the victim] in" because the defendant thought that the victim was an undercover agent who was going to turn him in to the police. On cross-examination, Mr. White admitted that he told Investigator Dickey that the conversation occurred in the summer of 1998 and that he later told Agent Wesson that it occurred in April or May. He acknowledged that he used crack cocaine daily and abused alcohol in the spring of 1998. His substance abuse problems continued into 1999 when he gave the statements to Dickey and Wesson. Three weeks before trial, he was under the influence of alcohol when he stole property from a Wal-Mart.

Richard Perry, Osepczuk's brother, testified as follows: On the day he returned from National Guard training in June or July 1998, Osepczuk and the defendant, whom he knew from high school, were in his living room listening to an audiotape. Osepczuk told him that the audiotape had the victim on it, and neither Osepczuk nor the defendant seemed upset or angry. The defendant left three to five minutes later. About two weeks later, he was exercising with the defendant and could tell that something was bothering the defendant. The defendant told him that the victim was on the audiotape and said that the victim was trying to "snitch [him] out" for selling drugs. The defendant said that he never sold drugs to the victim and that he was not on the audiotape. The defendant asked him if he knew of a good lawyer from their area. The defendant left about ten minutes later. Mr. Perry admitted that his statement to Agent Wesson states that the defendant told him that he had a witness who was going to testify against him and that he had to do something about it. He said that the defendant actually said that he had to do something about it, he had to get a good lawyer.

Ben Jordan, the boyfriend of the victim's mother, testified as follows: The Wilsons and the Crenshaws had known each other for a long time. In the fall of 1998, he was cleaning his car outside the victim's mother's house when the defendant arrived and asked him to listen to something. He listened to an audiotape of the victim. The defendant gave him the tape and asked him to tell the

victim's mother what the victim had been doing. The defendant said he had more tapes and that Mr. Jordan should tell the victim that "if I were him, I would just forget what is going on." He admitted that the defendant never threatened to shoot, kill, or do anything to the victim.

David Tyrone Hogues testified as follows: He knows the victim, the defendant, and Earnest Bumpus. He occasionally drank beer at the American Legion Club when the defendant was there. He never had a conversation with the defendant, the victim, and Mr. Bumpus in which the defendant said that if anyone "jam [him] up," the defendant would have to kill that person.

## I.  SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction for criminal responsibility for attempted first degree murder. He argues that the evidence presented at trial shows at most that he was merely associated with the men who attempted to kill the victim. He likens his case to that of State v. Transou, 928 S.W.2d 949 (Tenn. Crim. App. 1996). There, the court held that the mere presence of the defendants in the apartment where the police found the drugs or the defendants' mere association with the apartment owner was not sufficient to support a conviction for possession of cocaine for resale. Id. at 956. In this case, the defendant contends that the only evidence linking him to the crime was the possibility that he had telephone conversations with Osepczuk or Polidoro around the time of the attempted murder and the fact that he was briefly in Osepczuk's company the next day. He asserts that this circumstantial evidence showing his mere association with the perpetrators is insufficient to exclude every other reasonable hypothesis except that of his criminal responsibility for their actions. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

It is well established that circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). However, this circumstantial evidence "'must be not only consistent with the guilt of the accused but it must also be inconsistent with his [or her] innocence and must exclude every other reasonable theory or hypothesis except that of guilt.'" State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987) (quoting Pruitt v. State, 3 Tenn. Crim. App. 256, 267, 460 S.W.2d 385, 390 (1970)). In this way, the circumstantial evidence "'must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime.'" Id. at 896 (quoting Pruitt, 3 Tenn. Crim. App. at 267, 460 S.W.2d at 390). While following these guidelines, we must note that the jury decides the weight to be given to circumstantial evidence and that the "inferences to be drawn from such

-5-

evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 203 Tenn. 440, 452, 313 S.W.2d 451, 457 (1958).

Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2). First degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is defined as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

Viewed in the light most favorable to the state, the victim's testimony reveals that Osepczuk and Polidoro intentionally attempted to kill him. The men lured him to a secluded location with the promise of a ride to work. Osepczuk called for the victim to get in the car, began shooting at the victim as he approached, and continued to fire at the victim as he fled. Osepczuk and Polidoro pursued the victim into the bean field and beat him with the gun and a two by four until they believed him to be dead. During the beating, Osepczuk told the victim "You're dead." Believing that their conduct had caused the victim's death, they left the bean field. No evidence exists that the victim possessed a weapon or had threatened or provoked the men in any way before the incident. The evidence reveals that Osepczuk and Polidoro attempted to commit first degree murder. We now examine whether sufficient evidence exists to hold the defendant criminally responsible for their actions.

One is criminally responsible for a crime committed by another if by acting "with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). Common law principles governing aiders and abettors are embraced by the statutory provisions for criminal responsibility. Id., Sentencing Commission Comments; State v. Carson, 950 S.W.2d 951, 955 (Tenn.1997). To be criminally responsible for

the acts of another, a defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). In other words, the defendant must "'knowingly, voluntarily and with common intent unite with the principal . . . in the commission of the crime.'" Maxey, 898 S.W.2d at 757 (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). The requisite criminal intent may be inferred from the defendant's "presence, companionship, and conduct before and after the offense." State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982).

The defendant contends that nothing links him to the attempted murder other than his mere association with Osepczuk and Polidoro. The state contends that the evidence shows that the defendant sought to have the victim killed because the victim was a witness against him in the pending drug charges. It argues that the defendant approached Gary Claude White and Stephen Perry, Osepczuk's step-father, about "taking care of" the victim. It points to the defendant's previous threat to the victim that if anyone "jam him up," he would kill that person or have someone kill him. The state maintains that these conversations along with the telephone calls from the Traveler's and Park View Motels to the home of the defendant's aunt on the evening of the offense and the fact that the defendant met with Osepczuk the morning after the offense are sufficient to support the conviction.

The defendant's mere association with Osepczuk and Polidoro does not prove that the defendant solicited them to kill the victim with the intent that he would benefit from the results of the killing. On the other hand, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). In this respect, the telephone calls from Osepczuk's and Polidoro's motels to the defendant's aunt's home within hours of the offense and especially the defendant meeting Osepczuk the next day at Jennie Douglas's home are circumstances from which the jury could infer his involvement in the crime.

In Ball, the defendant and co-defendant drove to a club and spoke with some women in the parking lot. After the women left, the co-defendant broke into a truck and drove away at high speed. The defendant followed the co-defendant out of the parking lot but did not stop when the co-defendant wrecked a short distance away. The defendant was convicted of theft of property based upon his criminal responsibility for the co-defendant's actions. This court held that although the defendant's following the co-defendant was incriminating, it was insufficient to prove that the defendant assisted or encouraged the offense. Id. at 294. The present case can be distinguished because circumstantial evidence exists that the defendant encouraged or solicited the offense.

In the present case, the telephone calls and meeting do not constitute the sole evidence from which the jury could infer that the defendant solicited Osepczuk and Polidoro to commit the offense. Gary Claude White and Stephen Perry testified that the defendant was looking for someone to kill the victim. Mr. White, who worked on the defendant's house in the spring or summer of 1998,

testified that the defendant offered him ten thousand dollars to "do [the victim] in." Stephen Perry, Osepczuk's step-father, testified that in March or April of 1998, the defendant asked him if he knew anyone who could take care of the victim. The defendant argues that these witnesses were self-admitted crack cocaine addicts. Their admitted drug use goes to their credibility, a matter reserved for the jury. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.1987).

Furthermore, the jury could have reasonably inferred that the defendant had a motive to have the victim killed. The victim, a confidential drug informant, participated in several controlled drug purchases from the defendant. These purchases were recorded, and after being charged with these crimes, the defendant received recordings of the drug transactions in discovery. The testimony of Ben Jordan and Richard Perry reveals that the defendant had identified the victim's voice on the audiotape. Stephen Perry testified that the defendant feared prosecution for the drug charges and did not want to go to jail. Finally, the victim testified that in the summer of 1998, the defendant had threatened to kill or have killed anyone who "jam him up." This evidence reveals that the defendant wanted to have the victim killed in order to eliminate the victim as a witness against him in his drug cases.

As this court noted in Ball, in

convictions such as [this], where the evidence is entirely circumstantial, the jury must find that the proof is not only consistent with the guilt of the accused but inconsistent with his innocence. There must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypothesis except that of guilt.

973 S.W.2d at 292. In that case, this court noted that the evidence supported the defendant's probable guilt but that it was insufficient. The evidence failed to show that the defendant in Ball knowingly controlled the stolen truck, intended for the co-defendant to control it, or participated in a common plan or scheme to control it. Id. at 293. The co-defendant did not testify against the defendant, and the evidence suggested that it was just as likely that the co-defendant stole the truck of his own initiative rather than with the defendant. Id. On the other hand, in the present case, the evidence supports the inference that Osepczuk and Polidoro acted at the defendant's request rather than on their own. The victim testified that he was friends with Osepczuk, whom he had known since childhood. He testified that he had not performed any undercover work involving Osepczuk or Polidoro and that he knew of nothing that he had done to provoke the shooting and beating. Finally, although neither Osepczuk nor Polidoro testified against the defendant, Richard Perry testified that in June or July of 1998, he came home to find the defendant and Osepczuk listening to an audiotape. Mr. Perry said that Osepczuk told him that the audiotape was of the victim. Mr. Perry said that two weeks later, the defendant, who was visibly upset, told him the victim was on the audiotape and was trying to "snitch [him] out" for selling drugs. This evidence provides a basis for the jury to conclude reasonably that Osepczuk and Polidoro acted at the direction of the defendant rather than on their own.

Viewing the evidence in the light most favorable to the state, the defendant feared prosecution on drug charges because the victim, a police informant, had recorded the defendant selling him drugs. The defendant offered Gary Claude White ten thousand dollars to kill the victim and asked Stephen Perry if he knew anyone who would kill the victim. A little over two months before the offense, the defendant played the audiotape of the drug transaction for Osepczuk. The defendant told the victim that if anyone jammed him up, he would kill the person or have him killed and subsequently delivered the audiotape of the drug transaction to the victim's mother's house. Ben Jordan testified that the defendant told him that the victim should forget what happened. Within a few hours of the murder attempt, telephone calls were made from Osepczuk's and Polidoro's motels to the defendant's aunt's house. The following day, the defendant met with Osepczuk. The evidence is sufficient for the jury to find that the defendant was criminally responsible for attempted first degree murder.

## II. VENUE

The defendant contends that the trial court erroneously denied his motion for a change of venue because pretrial publicity about the case tainted the jurors. He argues that The Advocate, the newspaper purporting to have the largest circulation in Lawrence County, ran a front-page article on co-defendant Butch Osepczuk's trial two weeks before his trial began. He maintains that potential jurors should be expected to obviate the consequences that pretrial publicity will have on their judgment by stating that it will not affect them. He contends that alleged extraneous information gleaned from pretrial publicity influenced the jurors in this case, denying his right to a fair trial. The state contends that the defendant has waived this issue by failing to include the voir dire in the record, thereby failing to show that the potential jurors were familiar with the publicity or that he exhausted his peremptory challenges. Alternatively, it argues that the defendant has failed to show that the trial court abused its discretion in denying his motion for a change of venue because he has not shown that the jurors were biased against him.

The decision of whether to grant a motion for a change of venue based on pretrial publicity rests within the sound discretion of the trial court and will not be reversed on appeal unless the trial court abused its discretion. State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993). Furthermore, the defendant must show that the jurors were biased or prejudiced against him before his conviction will be overturned on appeal. State v. Melson, 638 S.W.2d 342, 360-61 (Tenn. 1992). Mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice. Prospective jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury. State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991). The test is "whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989). Because the defendant has failed to include the transcript of the jury selection, we are unable to review whether the jurors were exposed to the publicity or were biased against the defendant.

The defendant relies upon State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979), to argue that the timing, content, and pervasiveness of the publicity along with the severity of the

offense charged support a change of venue. We note that <u>Hoover</u> also listed eleven factors beyond those considered by the defendant including the "care exercised in selecting a jury," the "ease or difficulty in selecting a jury," the venire's "familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire," and the defendant's use of peremptory challenges. <u>Id.</u> The absence of the voir dire in the record prevents us from assessing these factors. In the absence of a complete record, we must presume that the trial court correctly denied the motion for a change of venue. <u>State v. Burton</u>, 751 S.W.2d 440, 451 (Tenn. Crim. App. 1988) (presuming that the jury was fair and impartial when the defendant failed to include the transcript of voir dire).

The defendant argues that when questioned by the court or counsel during voir dire, potential jurors should be expected to say that pretrial publicity will not affect their judgment but that common sense dictates that the publicity will affect them. By this, we believe the defendant is arguing that publicity can be so pervasive that it requires a change of venue without regard to the answers given by the potential jurors during voir dire. "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair," and the court may not presume unfairness based solely upon the quantity of publicity "in the absence of a 'trial atmosphere . . . utterly corrupted by press coverage.'" <u>Dobbert v. Florida</u>, 432 U.S. 282, 303, 97 S. Ct. 2290, 2303 (1977) (quoting <u>Murphy v. Florida</u>, 421 U.S. 794, 798, 95 S. Ct. 2031, 2035 (1975)); <u>State v. Grooms</u>, 653 S.W.2d 271, 274 (Tenn. Crim. App. 1983) (affirming the denial of a change of venue when the publicity had greatly decreased by the time of trial). Corruption of the trial atmosphere can result from inflammatory publicity immediately before trial or from the influence of the news media pervading the proceedings "either in the community at large or in the courtroom itself." <u>Murphy</u>, 421 U.S. at 798-99, 95 S. Ct. at 2035. On the other hand, the court will not presume that the jury's exposure to news reports regarding the defendant's prior convictions or the charged offense without more deprives the defendant of due process. <u>Id.</u> at 799, 95 S. Ct. at 2036.

The defendant has failed to prove that the pretrial publicity utterly corrupted the trial atmosphere. Although a local newspaper carried a front-page article on the co-defendant's trial two weeks before the defendant's trial began, he does not show what portion of the venire was exposed to the article or even what percentage of the population of Lawrence County subscribes to <u>The Advocate</u>, the newspaper that carried the article. At the hearing on the motion for a new trial, the defendant's investigator, Bobby Brown, testified that <u>The Advocate</u> claimed that its increase in advertisements revealed that it had the largest circulation in Lawrence County. This evidence does not show what portion of Lawrence County was exposed to the article.

Furthermore, the information contained in the August 18, 1999 article is not inflammatory, and the bulk of the article corresponds to the testimony given at the defendant's trial. The article does relate the testimony of James T. Cooper, a jail inmate, who gave a statement claiming that Osepczuk asked him to help kill the victim and told him that "Orlando would pay him $1200." The article states that Cooper disagreed with his statement at trial and testified that he learned on the streets that a drug dealer had a contract on the victim and that others besides Osepczuk had talked to him about the contract. Although one could infer from Cooper's repudiated statement that the

-10-

defendant had solicited Osepczuk to kill the victim, this information appears on the second page of the paper; the article states that Cooper rejected his statement at Osepczuk's trial; and as discussed above, the state presented evidence at the defendant's trial from which the jurors could infer that the defendant solicited Osepczuk to kill the victim. Importantly, the defendant did not show what percentage of Lawrence County residents received the newspaper containing this article. This information does not rise to the level that we may conclude that the jurors were tainted.

The defendant also mentions a January 21, 1996 article from The Advocate which contained pictures of the defendant and pertained to his arrest in the drug cases. This article ran two and one-half years before the attempted murder of the victim and three and one-half years before the defendant's trial. We do not believe that this article caused or contributed to the utter corruption of the trial atmosphere. Further, we note that at the pretrial hearing on his motion for a change of venue, the defendant also introduced a series of articles tracking the case. Articles appearing in The Advocate, on September 13 and 30, 1998, and October 11, 1998, do not mention the defendant. An article appearing in the January 31, 1999, edition discusses the reduction of the defendant's bond in this case. An August 22, 1999 article relates that the jury returned a guilty verdict in Osepczuk's trial. This article, like the August 18 article discussed above, mentions that the defendant also faces charges for the attack against the victim, that the victim is a potential witness against the defendant in pending drug cases, and that authorities believe that the defendant placed a contract on the victim's life and hired Osepczuk and Polidoro to carry out the "hit." Finally, the defendant introduced a August 20, 1999 article from The Democrat-Union, which relates that Osepczuk was convicted, that the state alleges that the crime occurred because of the victim's status as a potential witness against the defendant in pending drug investigations, and that the defendant, who is also charged in the case, is the next to be tried. To the extent that these articles mention the defendant, none of them contain inflammatory information or provide evidence beyond that given at his trial.

### III. HUNG JURY

The defendant contends that the trial court erred in returning the jury to their deliberations rather than accepting the jury's statement that they could not reach a unanimous verdict and by eliciting the numerical division of their split. He argues that the court violated his due process rights by directing the jury to resume deliberations after learning that the jury was divided eleven to one. He maintains that this created a coercive atmosphere which pressured the minority juror to change his or her decision. The state contends that the jury volunteered its numerical division and that the trial court did not direct any comments to the minority juror. It argues that after determining that further deliberations might result in a unanimous verdict, the trial court properly allowed the jury to continue deliberating.

On the first day of deliberations, the jury began deliberating at 4:11 p.m. Following a one and one-half hour break for supper, the jury resumed deliberations. At 10:02 p.m., the court informed the parties that the jury had told the court officer that it wanted to talk to the court, that it believed it was hung, and that it volunteered that it was divided eleven to one. The court stated that it was considering rereading the part of the charge that instructed the jurors to consult with each

other without doing violence to their individual judgments.  See Kersey v. State, 525 S.W.2d 139, 145 (Tenn. 1975) (instructing trial courts on the charge to be given a deadlocked jury).  The defendant objected to the court rereading the charge and asked the court to accept the jury's decision that it was hung.  The court made no specific ruling regarding the defendant's objection but conducted the following proceedings in the presence of the jury:

> FOREMAN: We are a hung jury, I think, is the expression.  We are at 11 to one, and that one has told us that no matter what we say or do, that person is going to stay with that vote.
>
> COURT: All right.  Have you had some good discussions since supper?  Has that been – has that worked well?
>
> JUROR: We – is it all right for me to tell you the ratio?
>
> COURT: Don't tell me specifics of what happened when and where, but have you had some meaningful discussions, since we came back from supper, after the break?
>
> JUROR: A mind was changed since supper.
>
> COURT: All right.  Do you feel that if you took another break, or even if you stay overnight, tonight, that that would help?
>
> FOREMAN: I do.
>
> COURT: Do you?  Well, what says the State?
>
> [PROSECUTOR]: If the jury feels that staying overnight might help, then that's what the State would ask that we do.
>
> COURT: And the defense?
>
> [DEFENSE COUNSEL]: Your Honor, we would leave it up to the Court.  Obviously, we're going to respect the decision of the jury.
>
> COURT: All right.  Let me ask you, do any of you want to stay and deliberate any more tonight?  (No response.)  Okay.  I see no hands.
>
> And I want to ask another question, and that would be a show of hands of all of you who think that staying another night and starting fresh in the morning might help?
>
> Now, I'm not sure I need to see a show of hands there, but do I have at least a majority of people that feel that way?  I don't really know how to do that way.  I'll ask for you-all to have some input.  That might be a mistake to see a show of hands.

But you are telling me, Mr. Foreman – Mr. Lindsey, that you feel like that might help?

FOREMAN: Well, the person has told us no matter what we do or say tonight. I don't really know, but it's kind of my opinion that it might. But that's simply my opinion.

COURT: All right. The Court is inclined to do that. I know it's late. Y'all have been deliberating since 4:15 or so. And even with a break, I know you're tired. . . . . So recess for tonight, and start back at 9:00 in the morning?

FOREMAN: Okay.

The following morning, the jury deliberated for just over an hour before returning a verdict finding the defendant guilty of attempted first degree murder. The court polled the jury, and each juror agreed with the verdict.

"Until the jury shall have reached a verdict, no one – not even the trial judge – has any right, reason or power to question the specifics of its deliberative efforts." Kersey, 525 S.W.2d at 141. The trial court may not inquire about the numerical division of a jury that is unable to agree. Braesfield v. United States, 272 U.S. 448, 449, 47 S. Ct. 135, 135 (1926). Although the actual effect of such an inquiry will vary from case to case, it is generally coercive and will bring an immeasurable and improper influence to bear upon the jury. Id. at 450, 47 S. Ct. at 136. Holding inquiry into the jury's division to be error, our supreme court has directed that:

> when a jury's deliberations have not produced a verdict, and it returns to the courtroom and so reports, the presiding judge should admonish the jury, at the very outset, not to disclose their division or whether they have entertained a prevailing view. The only permissive inquiry is as to progress and the jury may be asked whether it believes it might reach a verdict after further deliberations.

Kersey, 525 S.W.2d at 141. Although the trial court in the present case did not inquire about the jury's numerical division, it also failed to admonish the jury not to reveal its division despite receiving information from its court officer that the jury had volunteered its division to the officer. It should have admonished the jury not to reveal its division.

The state relies upon State v. Caruthers, 676 S.W.2d 935, 942 (Tenn. 1984), to argue that no error resulted from the jury volunteering its division. In Caruthers, the jury sent the court a note stating that it was divided eleven to one on the issue of punishment with no foreseeable change. Our supreme court held that the trial court did not err by recalling the jury and giving the Kersey instruction. Id. The opinion does not reveal whether the trial court admonished the jury not to reveal its division when it returned to the courtroom nor does it indicate whether the court engaged in a dialogue with the jury before giving the Kersey instruction. Because Caruthers focuses on the

propriety of the <u>Kersey</u> instruction during the sentencing phase of a capital case without revealing whether the trial court admonished the jury not to reveal its numerical division, it does not support the state's contention.

Although the better practice would have been to advise the jury not to reveal its division, the trial court's failure to do so does not end our inquiry. We note that the trial court may, in its discretion, order a jury to deliberate further after it appears that the jury is unable to reach a verdict, <u>Kersey</u>, 525 S.W.2d at 145, and unless a trial court causes a jury to reach a verdict in such a manner that is "patently not their free and untrammeled verdict, a new trial will not be granted." <u>Rushing v. State</u>, 565 S.W.2d 893, 896 (Tenn. Crim. App. 1977). The failure to admonish the jury not to disclose its numerical division is harmless error if it does not affirmatively appear to have affected the result of the trial. <u>Bass v. Barksdale</u>, 671 S.W.2d 476, 484 (Tenn. Ct. App. 1984) (analyzing the foreman's volunteering that one juror could not agree with the others in light of the trial court's failure to give the admonition suggested in <u>Kersey</u>) (citing T.R.A.P. 36(b)); <u>see</u> <u>State v. Dick</u>, 872 S.W.2d 938, 945 (Tenn. Crim. App. 1993) (holding any error in the trial court's inquiry into the numerical division of the jury to be harmless because it gave no <u>Allen</u> or dynamite charge and no evidence existed that the inquiry affected the verdict). Thus, we turn to the question of whether the trial court's failure to admonish the jury constitutes harmless error.

The defendant argues that after the jury had revealed its numerical division as well as the position of the minority juror and upon the court announcing that the jury would resume deliberations the next morning, the jurors must have understood that they needed to change the minority juror's vote. He maintains that in order to avoid this result, the court should have accepted that the jury could not come to a unanimous decision. The state contends that nothing in the court's discussion with the foreman was directed to the minority juror nor did the court's comments suggest that any of the jurors should abandon his or her convictions. We agree with the state. The trial court's dialogue with the jury was directed at determining whether further deliberations might help the jury arrive at a verdict. In <u>Lowenfield v. Phelps</u>, 484 U.S. 239, 240, 108 S. Ct. 546, 552 (1988), the Court held that the trial court's polling of the jury was not coercive in violation of <u>Braesfield</u> because the court asked the jurors whether further deliberations would be helpful in returning a verdict rather than asking about the merits of the case. Thus, in light of the fact that the trial court only sought to determine if further deliberations would yield a verdict, its failure to admonish the jury not to reveal its numerical division was harmless error.

### IV. JURY'S EXPOSURE TO EXTRANEOUS INFORMATION

The defendant contends that the jury's exposure to extraneous information violated his rights to a fair trial and to confront his accusers. He claims that juror Martha Jones revealed in an affidavit that the jury considered information about the defendant's involvement in the drug trade and his personal background and about co-defendant Butch Osepczuk's conviction that was not evidence at trial. He argues that the trial court erroneously refused to admit the affidavit into evidence at the hearing on the motion for a new trial and denied his motion for a new trial based upon the jury's exposure to the extraneous information. The state contends that the affidavit alone

did not show that the jury was exposed to extraneous information or was biased against the defendant. Thus, it argues that the trial court properly denied the defendant's motion for a new trial.

At the hearing on the motion for a new trial, the defendant sought to introduce Ms. Jones's affidavit, arguing that it revealed that the jury was exposed to extraneous prejudicial information. The affidavit states as follows:

> My name is Martha J. Jones. I was one of the jurors in the case of State v. Orlando Crenshaw, Case #20944. During the jury deliberations a number of the jurors made comments that "they knew more about what's going on in this town and in this case" than I knew. Statements were made that Orlando Crenshaw was "the big drug king pin of Lawrenceburg" and because he was involved in drugs he was guilty in this case.

> Statements were also made about the fact that the co-defendant, William Butch Osepczuk, had been tried a few weeks earlier and convicted and the only reason Osepczuk didn't testify against Orlando Crenshaw was because he was afraid of him.

> The foreman of the jury also talked about the defendant's personal background and life history. These statements included comments as personal as who the defendant and his family dated.

The state objected to the affidavit, contending that the juror could not impeach the verdict with the opinions and inferences of the other jurors during deliberations. The defendant asserted that the statements in the affidavit, including the fact that Osepczuk had been tried and convicted and information about whom the defendant had dated and his personal life, were not facts in evidence at trial. The trial court declined to admit the affidavit into evidence and found that

> any time you've got a trial, you've got underlying tones, and certainly the drug activity was a part of this trial, and it came out during the trial – and I think rightfully so – the contract for hire to kill the snitch because of the drug deals. And then you've got Mr. Crenshaw there at trial, facing the attempted murder with the underlying tones, there, of serious drug dealing. There [are] going to be a lot of theories probably bounced around in the jury room, and I think that's what this is.

At the end of the hearing, the court overruled the motion for a new trial on all grounds.

Rule 606(b), Tenn. R. Evid., governs a juror's competency to testify regarding the validity of the verdict:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations

or to the effect of anything upon any juror's mind or emotion as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

As the Advisory Commission Comment notes, this rule is the codification of the supreme court's adoption of Rule 606(b), Fed. R. Evid., in State v. Blackwell, 664 S.W.2d 686, 688 (Tenn. 1984). Both fact and opinion can comprise extraneous information influencing a jury. Blackwell, 664 S.W.2d at 689. If the defendant shows that the jury has been subjected to extraneous prejudicial information or improper influence, then we presume prejudice and the burden shifts to the state to rebut this presumption by either explaining the exposure or proving that it was harmless. Id. In the present case, the trial court did not find the information to be extraneous but rather characterized the statements as theories considered by the jury, and thus, the burden never shifted to the state.

The state contends that Ms. Jones's affidavit is insufficient to show that the jury was exposed to extraneous prejudicial information and that the defendant failed to show bias on the part of the jury. It argues that the affidavit contains vague allegations of statements made by unidentified jurors during the deliberations and that none of this information was subject to cross-examination. It maintains that the affidavit fails to allege that the jury had contact with a third party regarding the merits of the case or that the jury separated.

The defendant contends that Ms. Jones's affidavit reveals that outside influence infected the jury's deliberations and that some of the jurors essentially presented testimony, which was not subject to cross-examination, during deliberations. He cites Briggs v. State, 207 Tenn. 253, 338 S.W.2d 625 (1960), a pre-Blackwell case in which the defendant was convicted of voluntary manslaughter despite his claim that he acted in self-defense in the killing. During deliberations, one juror told other jurors that the defendant had a bad temper, would kill if angered, and had killed the juror's brother. These statements were not in evidence. The defendant in Briggs argued that the juror's statements violated his right to confrontation. In reversing and remanding for a new trial, the court quoted with approval the following:

"Most of the courts which have received jurors' affidavits or testimony as to improper statements made by other jurors in the course of the deliberations have taken the view that where the statement in question related to a matter not in evidence, and having a tendency to reflect upon the accused's claim of innocence or the degree of his guilt, it would be presumed that it did in fact have an improper effect upon the jury's deliberations and was prejudicial to accused."

-16-

Id. at 259, 338 S.W.2d at 627-28 (quoting W. E. Shipley, Annotation, <u>Admissibility and Effect, in Criminal Case, of Evidence as to Juror's Statements, during Deliberations, as to Facts Not Introduced into Evidence</u>, 58 A.L.R.2d 556, 568 (1958).

"Extraneous means 'coming from without.'" <u>State v. Coker</u>, 746 S.W.2d 167, 171 (Tenn. 1988) (holding that the jurors' alleged discussion about the possibility that the defendant would hire someone to kill them was inadmissible because the defendant had not shown that the jury learned of the threat from an outside source). Without question, information that can be inferred from the evidence offered at trial is not extraneous information. "Indeed, jurors are free to use their common knowledge and judgment derived from experience, observation, and reflection to decide whether a fact is logically deducible or reasonably inferred from the evidence." <u>State v. Nesbit</u>, 978 S.W.2d 872, 886 (Tenn. 1998) (analyzing the sufficiency of the evidence regarding an aggravating factor). In <u>State v. Hailey</u>, 658 S.W.2d 547 (Tenn. Crim. App. 1983), the defendant wanted to introduce the testimony of two jurors, who would relate that during deliberations, another juror told the jury that the defendant had previously been convicted of murder and should not get another chance. The court held that because the jury heard evidence regarding the defendant's first trial during the testimony, the statement was not extraneous information. <u>Id.</u> at 553.

In the present case, the jury could have inferred the statements in Ms. Jones's affidavit relating to the defendant's involvement in the drug trade, Osepczuk's fear of testifying against the defendant, and aspects of the defendant's background from the evidence presented at trial. On the other hand, we note that the statement that the other jurors knew more about what was going on in this case than Ms. Jones suggests that the other jurors may have revealed more specific information than that given in the broad categories mentioned in the affidavit. Without Ms. Jones's testimony at the hearing on the motion for a new trial, the trial court had no opportunity to explore the exact nature of the information allegedly revealed by the other jurors. In any event, the jury could not infer from the evidence at trial that Osepczuk had been tried and convicted two weeks before the defendant's trial and the information about whom the defendant and his family members dated.

Information imparted to the jury by a third party during the trial or deliberations is extraneous information. <u>Blackwell</u>, 664 S.W.2d at 688-89 (holding a juror's conversation with the victim's mother to be "improper outside influence that resulted in the transmission of prejudicial information to the jury"). In the present case, Ms. Jones's affidavit does not allege that the jurors learned the facts not in evidence from a third party during the trial or deliberations. Instead, the defendant assumes that the jurors had pretrial knowledge of this information but argues that the information is extraneous because it was not a part of the evidence at trial. A distinct difference exists when a juror having particular knowledge of events related to the case is totally honest during voir dire and the defendant has a full opportunity to question the juror about that knowledge. Under such circumstances, the fact that the defendant failed to question the juror fully before accepting him or her as a trial juror is of no consequence. Acceptance of the jurors effectively constitutes the parties' consent that the jurors, with all their knowledge and experiences, will decide the case. <u>See</u>, <u>e.g.</u>, <u>United States v. Rigsby</u>, 45 F.3d 120, 125 (6th Cir. 1995). <u>C.f.</u> <u>United States v. Herndon</u>, 156 F.3d 629, 635 (6th Cir. 1998) (distinguishing <u>Rigsby</u> based in part upon the juror's failure to reveal that

he may have had business dealings with the defendant despite defense counsel asking on voir dire if the jurors knew the defendant). If such were not the rule, it would be difficult to select juries, particularly in rural venues.

> The twentieth century American jury has moved a long way from its medieval origins. Today's juror must be "indifferent" and "[h]is verdict must be based upon the evidence developed at the trial." Still we would not lightly assume that the jury's original role as the voice of the country may not sufficiently persist that neither the specific guarantees of an impartial jury and of confrontation nor the more general one of due process would be violated simply because jurors with open minds were influenced to some degree by community knowledge that a defendant was "wicked" or the reverse, even though this was not in evidence. One, although by no means the only, purpose of the insistence on trial in the vicinage both in Article III, § 2, and in the Sixth Amendment, must have been to entitle a defendant to trial where he is known–and this may sometimes work against him rather than in his favor. Indeed there are still sections of the country where it might be impossible to find twelve jurors who were totally ignorant about a defendant.

United States ex. rel Owen v. McMann, 435 F.2d 813, 817 (2d Cir. 1970) (citations and footnote omitted). Absent a showing that a potential juror failed to disclose facts after questioning that should reasonably elicit those facts, dissemination of those facts to other jurors during deliberations would not be improper.

In the present case, we have no way to review whether the voir dire questions should have or did elicit the facts not in evidence because, as noted above, the defendant failed to include the transcript of the voir dire in the record on appeal. However, we also note that during the defendant's argument on the venue issue at the motion for new trial hearing, the state argued that the jurors were questioned during voir dire about their exposure to pretrial publicity and what effect the publicity would have on them. The trial court recalled that one juror revealed during voir dire that he knew the defendant when the defendant was a child and that the defendant grew up with the juror's children. The court then observed that it did not recall that the defendant had exhausted his peremptory challenges, and it found Ms. Jones's affidavit inadmissible to prove that the jury was influenced by pretrial publicity. The defendant bears the burden of showing that the jurors were exposed to extraneous information and that their testimony is thereby permitted under Rule 606(b), Tenn. R. Evid. See Blackwell, 664 S.W.2d at 689 (holding that in order to shift the burden to the state to prove the absence of prejudice, the defendant must show more than the fact that a juror mingled with the public but, instead, must show that extraneous prejudicial information or improper influence resulted from the contact with a third party). The trial court, which had the benefit of hearing the voir dire, declined to admit Ms. Jones's affidavit on the venue issue as evidence that the jury was tainted by pretrial publicity. See State v. Young, 866 S.W.2d 194, 196-97 (Tenn. Crim. App. 1992) (observing that the trial court was in the best position "to assess the nature of the extraneous information, as well as its effect, if any, upon the jury"). In light of the absence of the

-18-

voir dire transcript from the record, we defer to the trial court's ruling and hold that the defendant has failed to meet his burden of showing that the jury was exposed to extraneous information.

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE