# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 14, 2009 Session

## STATE OF TENNESSEE v. ALEJANDRO CHEVO GUANA a.k.a. ALEJANDRO CHEVO GOUNA

### Direct Appeal from the Circuit Court for Tipton County
### No. 5561    Joseph H. Walker, Judge

### No. W2008-01304-CCA-R3-CD   -   Filed June 29, 2010

Appellant, Alejandro Chevo Guana, was convicted of first degree premeditated murder for killing Tennessee State Trooper Calvin Jenks during a routine traffic stop. He was sentenced to life in prison. He was also convicted of possession of marijuana with intent to deliver, for which he was to serve one year. He appeals, arguing the trial court erred in: (1) limiting his cross-examination of his co-defendant to reveal alleged bias; (2) denying a change of venue; (3) refusing to use his proffered jury questionnaire; (4) denying his request for individual and sequestered voir dire; and (5) finding the evidence sufficient for conviction where, he claims, the only evidence of premeditation was the testimony of his accomplice. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Blake D. Ballin, Memphis, Tennessee, for the appellant, Alejandro Chevo Guana.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., and Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Background

### A. Factual Background

There is no dispute that Appellant shot and killed the victim, a trooper with the Tennessee Highway Patrol, during a routine traffic stop. Indeed, Appellant does not dispute most of the facts that were adduced at trial. In sum, those facts tell the following grim story.

Appellant and his life-long friend, Orlando Garcia, purchased between 2.5 and 3.5 pounds of marijuana in their hometown, Austin, Texas, and drove to Tennessee to try to sell it. They were both minors at the time. They rented a silver Toyota Corolla, and Appellant acquired two guns—a .25 caliber and a .375 caliber—for the trip. They knew virtually no one in Tennessee, save Tyler Thomas, a friend of one of Appellant's ex-girlfriends. Ms. Thomas joined them in Millington, and the three drove to Memphis. There, they trolled the local malls looking to sell their marijuana. After having little success, they drove to Nashville where they got a room at a Best Western hotel and stashed most of the marijuana. Over the course of the next couple of days, they continued to try to sell marijuana. In addition to scouting the malls, they also drove through various neighborhoods looking for prospective buyers. They knew no one in Nashville.

After a few days, Appellant and Mr. Garcia drove Ms. Thomas back to Millington. The three stopped at a rim shop, and Ms. Thomas called someone to pick her up. While at the rim shop, Appellant met two men: Henry King and Shamus Pringle. Mr. Pringle said he might know someone who would be interested in buying some of Appellant's marijuana.

Appellant and Mr. Garcia left Millington to return to Nashville. Mr. Garcia was driving, and at that point they had only two or three ounces of marijuana with them, which was stashed in the middle console. Somewhere near Brownsville, the victim stopped them for speeding. The victim approached the driver's side of the car and asked Mr. Garcia for his license. When Mr. Garcia said he did not have his license with him, the victim asked him to get out and stand by the trunk of the car. The victim asked Mr. Garcia a few more questions and then asked whether there were any drugs in the car. Mr. Garcia initially said no, but after the victim pressed him, Mr. Garcia admitted that there were drugs in the middle console. The victim returned to the driver's door, took off his hat, placed it on top of the car, and leaned into the vehicle. Appellant had been sitting in the front passenger seat the entire time. As the victim leaned in, he asked Appellant where the "dope" was. Appellant then shot the victim twice in the head with the .25 caliber handgun. Mr. Garcia rushed to the front of the car, pulled the victim's body, threw it onto the highway, and drove away. The entire event was recorded by the video camera in the victim's patrol car.

After the shooting, Appellant and Mr. Garcia first drove to a gas station, looking for Armor All wipes to clean the car. The gas station did not sell them, so they stopped at Wal-Mart in Brownsville. They bought the wipes and cleaned out the car. They discarded the used wipes, the shells, the victim's flashlight, and a blood-stained towel in a trash can at Wal-

Mart. They also decided to change clothes, so they bought new shirts and put them on. They then drove the rental car to a nearby apartment complex, where Appellant bent the license plate to make it difficult to see. The two men decided to abandon the rental car in the Brownsville apartment complex.

Appellant called Mr. Pringle and asked him for help. He said that he got Mr. Garcia into trouble and asked Mr. Pringle to drive the two back to Nashville. Mr. Pringle and his associate, Mr. King, agreed. When the four arrived at the Nashville hotel, Appellant gave Mr. Pringle approximately two pounds of the marijuana he had stashed there, and Messrs. Pringle and King left. Mr. Pringle testified that during the drive, Appellant was in the back seat "just [being] his self."

On the way back to Millington, Messrs. King and Pringle were picked up for a traffic violation. As they were being processed at the police station, it became clear that the two might have information related to the victim's death. Later that night, they guided the police back to the hotel room in Nashville, where the police apprehended Appellant and Mr. Garcia.

## B. Pre-Trial Motions

Appellant was charged with first degree premeditated murder. In a separate trial, Mr. Garcia was convicted of facilitation of first degree murder. He was awaiting sentencing at the time of Appellant's trial.

Prior to trial, Appellant filed a series of motions. Several concerned the jury selection process, and one requested a change of venue. At the trial court's hearing on the motions, Appellant called Alyson Frazier to testify. Ms. Frazier testified that she worked for a company that was hired to analyze the degree to which Tipton County residents had been exposed to information about Appellant's case. Ms. Frazier conducted a telephone survey of the residents and reviewed a sizeable number of media reports concerning the case.

Ms. Frazier's survey involved calling 350 Tipton County residents. She explained that she called roughly every twelfth name in the telephone book and attempted to ask each person nine questions. She was able to speak with only 202 of the residents she called. Fifty-two residents declined to participate. Of the remaining 150 respondents, 128 were aware of the case, mostly from media reports. Of those respondents, 61% thought Appellant was guilty, whereas 39% either did not know or had no opinion. In addition, 43 respondents knew the victim personally. Finally, Ms. Frazier testified that 18% of those surveyed thought "it would be fair if [Appellant] was tried outside of Tipton County," 49% said it would not be fair, and 33% did not know or had no opinion.

As part of her analysis, Ms. Frazier also accumulated approximately 500 pages of media reports related to the victim's death and the subsequent legal proceedings. Ms. Frazier estimated that her results accounted for slightly more than fifty percent of the reports about the case. The reports contained, among other things, a transcript of a confession given by Appellant during a juvenile detention hearing.

In addition to the venue motion, Appellant requested that the trial court conduct individual voir dire of potential jurors outside the presence of the rest of the jury pool. Appellant argued that individual and sequestered voir dire would allow the Appellant to determine the content of the media reports to which prospective jurors had been exposed. In particular, Appellant contended it would help him more effectively discover whether jurors had been exposed to potentially prejudicial material—such as the inadmissible juvenile court confession—without risk of tainting the remaining members of the pool. Appellant also proffered a 22-page jury questionnaire, which he asked the trial court to use as a supplement to its standard questionnaire. The questionnaire, Appellant asserted, was necessary in order to negate the widespread knowledge of the case.

The trial court denied Appellant's motion to change venue, holding that Appellant had failed to demonstrate "undue excitement" in the community regarding the case. It specifically noted that the extensive media reports merely described the events in the case. With respect to the survey analysis conducted by Ms. Frazier, the court noted that it failed to include the questions that are critical in voir dire, such as whether the respondents could set aside what they had heard and judge the case based on the evidence presented at trial. The court further noted that it was able to empanel a jury "without difficulty" in the case of Appellant's co-defendant, suggesting that it would likely be able to do so in Appellant's case as well. The court also denied Appellant's motion for individual and sequestered voir dire. The court stated that it would conduct voir the same way it was conducted in Mr. Garcia's trial. It also said it would consider Appellant's proposed questionnaire and perhaps include some of Appellant's proffered questions in addition to the court's standard jury questionnaire.

## C.  Voir Dire

Jury selection in the case was completed in half a day. The trial court drew jurors from an enlarged pool that had completed the court's standard jury questionnaire. Again declining Appellant's request for individual and sequestered voir dire, the court first randomly selected twenty-four individuals. The group of twenty-four was then collectively and individually questioned by the court. The court had previously determined that the jury would be sequestered during the trial, and it dismissed without objection several jurors who indicated they would have personal difficulty with sequestration. As the court dismissed

prospective jurors, the clerk called new veniremen from the pool. In the Circuit Court for Tipton County, at least on this occasion, a single jury pool may be used for multiple cases, and individual jurors may hear multiple cases during their term of service. At this point in the voir dire for Appellant's case, all of the remaining veniremen had been prospective jurors in previous cases; all but two had previously served on juries in criminal trials; two individuals had served on a jury together in a previous criminal trial; and many veniremen had been on juries deciding cases being tried by the State's counsel in this case.

After the initial dismissals, all but one of the remaining jurors indicated that they had heard of the case. The court dismissed three individuals who indicated that they had a biased view of the case because of the information they had heard. Other than those three, only two of the remaining veniremen indicated that they had any access to information about the case besides media reports. The first said her spouse was a volunteer firefighter who had been called to the scene the night of the shooting. The second said her brother was on the scene as well. Both told the court that they had not spoken with their family members about the details of the case and that they could set aside anything they had previously heard about the case and decide the matter on the evidence. Appellant later used peremptory challenges to strike both jurors. The remaining jurors said their only source of prior information about the case was the media and vowed they could set aside anything they had previously heard and decide the case on the evidence adduced at trial. Ultimately, the jury was empaneled with Appellant using only four of his peremptory challenges.

During the jury selection process, Appellant again renewed his motion for a change of venue and for individual and sequestered voir dire. Appellant argued that many of the veniremen had already developed some relationship with the prosecution during their previous jury service. Appellant also argued that too many of the prospective jurors were aware of the case to allow for a fair trial. Finally, Appellant contended that sequestrated voir dire was necessary to inquire about the specific media reports to which the prospective jurors had been exposed. The court denied both motions. In doing so, the court noted, "[t]here's no need for the juror to say what they've read or what they remember." It concluded by saying, "[w]e'll proceed with the jury selection and see how it goes. And if you feel like . . . we need to do something different, let me know." The State suggested that individual questioning might be appropriate for the juror whose husband responded as a volunteer firefighter, but Appellant's counsel declined the opportunity. Thereafter, Appellant never requested any particular juror be questioned individually.

**D. Trial**

After the jury was sworn, Appellant was tried and convicted in a four-day trial. During the trial, the State called Appellant's co-defendant, Mr. Garcia, to testify.[1] Mr. Garcia testified that he had been previously convicted in his trial, but the trial court prohibited the State from eliciting that he was convicted of facilitation of first degree murder. Mr. Garcia also testified that he had not received any consideration for testifying.

Mr. Garcia testified that he and Appellant bought the marijuana and rented a car prior to their trip to Tennessee. He explained that Appellant acquired the two guns, which the two kept "[f]or protection" while they were trying to sell the marijuana.

They then drove to Tennessee. Mr. Garcia testified that somewhere near Texarkana, Appellant informed Mr. Garcia that "[h]e might have to do a cop" during the trip. But Mr. Garcia could not recall the circumstances leading to the comment

Mr. Garcia said that he was driving the rental car on Highway 14 near Brownsville when he was pulled over for speeding. As they were being pulled over, Appellant asked Mr. Garcia, "What do you want to do?" and Mr. Garcia responded, "Nothing, let's just see what happens." The victim approached the car and asked Mr. Garcia if he had a valid license. Mr. Garcia replied that his license was valid but that he had lost it. The victim asked him to step out of the car. After initially denying that there were drugs in the car, Mr. Garcia eventually admitted there were drugs in the console. The victim walked to the front driver's side door and leaned in to search for the drugs. He was shot by Appellant with the .25 caliber handgun.

Mr. Garcia moved the victim's body away from the car and drove toward Brownsville. A little further down the road, Appellant told him to stop at a gas station so Appellant could buy some Armor All wipes to clean the car. Unable to find any wipes at that store, they proceeded to a Wal-Mart. While at the Wal-Mart, they cleaned out the car, disposed of some of the evidence, and changed clothes.

When they left Wal-Mart, Appellant drove the car to a nearby apartment complex. Mr. Garcia testified that Appellant decided that they should abandon the car because it would be on the video in the victim's car. He also bent the car's license plate and called two individuals he met earlier that day to pick them up.

---

[1] Because Appellant limits his issues on appeal, we need only discuss certain portions of Mr. Garcia's testimony in detail. The remainder of Mr. Garcia's testimony, and the record as a whole, when read in the light most favorable to the State, see State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), bear out the rest of the factual summary given above.

On cross-examination, Mr. Garcia acknowledged that, although he did not want to, he was not forced to testify. He also acknowledged that he had yet to be sentenced for his conviction and that the same judge and prosecutors would be involved in his sentencing. But at the State's objection, the trial court did not allow Appellant's counsel to question Mr. Garcia about the ten-year range (15 to 25 years) within which Mr. Garcia could be sentenced. Instead, the court admonished the jury that

> with regard to the questions being asked about sentencing of this particular defendant, the Court handles that sentencing at a separate sentencing hearing. It's not related to any of your job here today. The Court is allowing the questions for the purposes that defense counsel says he's asking them; and that is, whether it's had any influence or swayed his testimony one way or the other.

Additionally, the trial court did not allow counsel to question Mr. Garcia about possible federal charges that he may have been facing.

Mr. Garcia testified that, although he was very close to Appellant, he did not believe him when he said he might have to "do a cop." They did not discuss the topic further, and they made no plans regarding how to act if such a situation arose. Similarly, he explained that Appellant asked, "What do you want to do?" when they were pulled over, he thought Appellant was questioning whether they should try to get away from the officer. He did not think Appellant was asking if he should kill the victim. As a result, Mr. Garcia and Appellant "improvised" in the aftermath of the shooting. He recalled that Appellant called Mr. Pringle and told him that he had "f[***]ed up." Mr. Garcia described Appellant as "excited" and "freaking out and crying."

Appellant's counsel also pressed Mr. Garcia regarding inconsistencies in the accounts he told police and his testimony at trial. In particular, he acknowledged that he lied to the police about how Appellant came in contact with Ms. Tyler—he originally told the police they met through MySpace. In addition, he admitted that he did not tell police about Appellant's "do a cop" comment until he had already given police several statements.

On redirect examination, Mr. Garcia said that he was testifying against Appellant because his mother told him to "do the right thing."

At the conclusion of Mr. Garcia's testimony, the court excused the jury to allow Appellant's counsel to make an offer of proof concerning his claim that Mr. Garcia was motivated to testify, in part, to avoid possible federal charges. The following is the sum total of the evidence derived during the proffer:

Q. Mr. Garcia?

A. Yes, sir.

Q. I asked you a few minutes ago about federal charges?

A. Yes, sir.

Q. Have you been informed that the federal government is possibly looking into charging you with any crime?

A. Yes.

Q. Is that something you've thought about and discussed with your lawyer? Well, don't answer that. I'm sorry.
   What kind of charges are they looking into? What's your understanding of that?

A. Trafficking and a death occurred.

Q. I'm sorry?

A. While trafficking a death had occurred.

Q. Had to do with—I'm sorry—a death occurring while trafficking narcotics?

A. Yes, sir.

Q. Do you think that coming here and testifying today has anything to do with whether or not the Feds will charge you with a crime?

A. Yes, sir. I'm hoping that.

Q. You're hoping that by testifying today that the Feds may not charge you?

A. Yes, sir.

At the close of Appellant's proffer, the court reaffirmed its ruling that the questions were inappropriate before the jury. As the trial court previously noted, Mr. Garcia's concerns regarding a federal prosecution were entirely speculative.

The jury convicted Appellant of first degree premeditated murder and possession of marijuana with the intent to deliver. It then deadlocked on whether to enhance Appellant's sentence to life without parole. He was therefore sentenced to life with the possibility of parole. Appellant filed a motion for a new trial, which was denied. This appeal followed.

## II. Analysis

Appellant raises five issues for our review. Those issues are whether the trial court erred in: (1) limiting his cross-examination of his co-defendant to reveal alleged bias; (2) denying a change in venue; (3) denying his proffered jury questionnaire; (4) denying his request for individual and sequestered voir dire; and (5) finding the evidence sufficient for

conviction where, he claims, the only evidence of premeditation was the testimony of this accomplice. We begin with the coss-examination issue.

## A. Cross-Examination

In Tennessee, criminal defendants are entitled to confront witnesses against them under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. As the United States Supreme Court has explained in the context of the federal right, "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination," which includes the opportunity to expose "a witness' motivation in testifying." Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (quotation marks, brackets, and emphasis omitted). In particular, a defendant can cross-examine a witness "regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006). However, the right to confrontation is not a right to limitless cross-examination. See id.; see also Van Arsdall, 475 U.S. at 679 (noting that confrontation does not guarantee a right to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish").

Instead, the exercise of the right to confront "is controlled by the trial judge," and "the trial court's decision will be upheld absent an abuse of discretion." Rice, 184 S.W.3d at 670 (quotation marks omitted). Appellant can demonstrate such an abuse by showing the trial court placed "undue restriction" on his right. Id. In other words, he "must show that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness[]." Id. (quotation marks omitted).

Two cases from our supreme court precedent exemplify the type of restrictions considered to be "undue." In Rice, the trial court allowed defense counsel to question a state witness about a prior conviction and the sentence he received. 184 S.W.3d at 669-70. However, it prohibited counsel from inquiring about why the witness received a reduced sentence of six years on community corrections—even though the sentencing range for his offense was between eight and twelve years incarceration—or whether the leniency he received motivated his testimony. Id. In Rice, even the State conceded that the restrictions went too far. Id. at 670.

Similarly, defense counsel's cross-examination in State v. Sayles was also unduly restricted. 49 S.W.3d 275 (Tenn. 2001). In Sayles, the State's star witness in a murder case initially refused to testify because of threats made against him, his girlfriend, and their child.

Id. at 277. After the State spoke with the witness privately, he changed his mind and provided damaging evidence against the defendant. Id. at 277-78. Shortly after the cross-examination, the prosecutor asked the judge to reduce the witness' bond and announced that the charge submitted to the grand jury against the witness would likely be lowered from aggravated to simple robbery. Id. at 278. The trial court denied defense counsel's request to inform the jury of the developments because the witness testified he was not promised anything. Id. The trial court prohibited counsel from making an offer of proof on that point. Id.

In the instant case, the trial court allowed Appellant's counsel to reveal the critical facts that would allow a jury to appropriately draw inferences about Mr. Garcia's credibility. Specifically, Appellant's counsel was able to reveal that Mr. Garcia was awaiting sentencing in his own case, that he faced the same prosecutors, that he would be sentenced by the same judge, and that there was a range within which he would be sentenced. Therefore, the jury was left with all the facts necessary to conclude that by testifying favorably for the State, Mr. Garcia was attempting to curry favor with the prosecutors and thereby boost his chances of getting a lower sentence. In addition, Appellant's cross-examination also revealed that Mr. Garcia's prior statements to the police regarding this case—including his statement that Appellant said he might have to "do a cop"—had been inconsistent. In other words, the jury was also aware of other facts that might suggest his testimony was not reliable.

But, the trial court excluded two lines of questions: the exact range of potential sentences and Mr. Garcia's hope of avoiding federal prosecution. Appellant claims the trial court erred in excluding both lines and that each exclusion warrants reversal of his conviction. We disagree.

The first line—the exact range of potential sentences Mr. Garcia faced—is not akin to the facts withheld from the jury in either Sayles or Rice. The trial court allowed sufficient questioning regarding the potential range of punishment to inform the jury that Mr. Garcia hoped to receive a lower sentence because of his cooperation. From there, the jury could discount Mr. Garcia's testimony as it believed necessary. The exact range of possible sentences was not necessary to uncover any bias and would add only marginally to the jury's understanding of Mr. Garcia's credibility.

The line of questioning regarding possible federal charges presents a closer question. Appellant's proffer elicited that Mr. Garcia was indeed motivated in part by a fear of federal charges. And, the evidence is unmistakable that Mr. Garcia hoped his testimony for the State might head off an indictment. While the trial court was correct that Mr. Garcia's concerns were only speculative, the evidence is that those concerns were a genuine motivation for his testimony. As such, prohibiting Appellant from questioning him on that topic prevented him

from exposing part of Mr. Garcia's motivation to the jury. See Van Arsdall, 475 U.S. at 678-79.

Yet, the overly-restrictive limits on Appellant's questioning was harmless. See Rice, 184 S.W.3d at 670 (trial court rulings denying a defendant's right to confrontation are subject to harmless error analysis); see also Van Arsdall, 475 U.S. at 681 (same). Indeed, we are confident that the trial court's decision to prohibit questions regarding Mr. Garcia's concerns about a potential federal indictment were harmless beyond a reasonable doubt. See Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999). As explained above, the trial court permitted multiple lines of questioning that exposed Mr. Garcia's potential bias and motivations. The jury knew Mr. Garcia was trying, in part, to get a lower sentence and that his testimony might have an impact on that sentence. It also had reason to conclude that Mr. Garcia's testimony was factually unreliable. In other words, the jury had all the pieces it needed to discount Mr. Garcia's testimony if it so chose. Adding Mr. Garcia's concerns about a potential federal indictment would not add much to the mix. The jury already credited Mr. Garcia's testimony in the face of evidence undercutting his credibility. We are convinced beyond a reasonable doubt that it would have still credited Mr. Garcia's testimony even knowing that he feared a federal charge.

## B. Jury Issues

Appellant raises three issues regarding how the trial court empaneled the jury. First, he contends that the pre-trial publicity poisoned the jury pool, necessitating a change of venue. Second, he asserts that the trial court should have utilized his detailed questionnaire to mitigate the impact of the pre-trial publicity. Finally, he argues that the trial court erred in prohibiting counsel from conducting individual and sequestered voir dire of each prospective juror. We address each argument in turn, but we begin with some basics regarding the jury selection process.

"The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). "[J]urors need not . . . be totally ignorant of the facts and issues" of the case. Murphy v. Florida, 421 U.S. 794, 800 (1975). Indeed, "[t]he mere fact that prospective jurors know something about a case at the time of impaneling is not unusual," and such exposure "does not automatically constitute constitutional error." State v. Hugueley, 185 S.W.3d 356, 390 (Tenn. 2006). To prohibit the qualification of a juror with "any preconceived notion as to the guilt or innocence of an accused . . . would be . . . an impossible standard." Murphy, 421 U.S. at 800 (quotation marks omitted). "Accordingly, jurors may sit on a case, even if they have formed an opinion on the merits of the case, if they are able to set that opinion aside and

render a verdict based upon the evidence presented in court." State v. Mann, 959 S.W.2d 503, 531 (Tenn. 1997); see also Tenn. R. Crim. P. 24, cmt.

The defendant can challenge a prospective juror's assurances of impartiality, see Murphy, 421 U.S. at 800, but "the determination of impartiality remains a matter within the trial court's discretion," and its determination "may be overturned only for manifest error," Mann, 959 S.W.2d at 532 (quotation marks omitted). This is true whether the information the prospective juror encountered was admissible or inadmissible. See id. Regardless, it is Appellant's burden "to prove prejudice . . . in the selection of a jury. Prejudice will not be presumed." State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993).

## 1. Change of Venue

Tennessee Rule of Criminal Procedure 21 provides that a trial court may change venue "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). The decision to change venue rests in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. See State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001). As noted above, the fact that prospective jurors have been exposed to pre-trial publicity is not sufficient to warrant a venue change. "Moreover, before an accused is entitled to a reversal of his conviction on the ground that the trial judge erroneously denied his motion for a change of venue, *he must demonstrate that the jurors who actually sat were biased and/or prejudiced*." Mann, 959 S.W.2d at 532 (quotation marks, brackets, and ellipses omitted; emphasis added). To be sure, press coverage and inflammatory publicity can corrupt a trial atmosphere, see, e.g., Dobbert v. Florida, 432 U.S. 282, 303 (1977), but "the court will not presume that the jury's exposure to news reports regarding . . . the charged offense without more deprives the defendant of due process," Crenshaw, 64 S.W.3d at 387. Furthermore, "the failure to challenge for cause or . . . use any available peremptory challenge to remove objectionable jurors precludes reliance upon the alleged disqualifications of jurors on appeal." State v. Thacker, 164 S.W.3d 208, 238 (Tenn. 2005). In short, Appellant has a very tall burden to overcome in demonstrating that the specific jurors empaneled in his trial were biased or prejudiced against him. See, e.g., State v. Rogers, 188 S.W.3d 593, 622 (Tenn. 2006); Thacker, 164 S.W.3d at 238; State v. Melson, 638 S.W.2d 342, 360 (Tenn. 1982); Crenshaw, 64 S.W.3d at 386.

Our courts have generally relied upon seventeen factors to aid in the evaluation of a motion for a change of venue. Those factors include the: (1) nature, extent, and timing of pre-trial publicity; (2) nature of publicity as fair or inflammatory; (3) particular content of the publicity; (4) degree to which the publicity complained of has permeated the area from which the venire is drawn; (5) degree to which the publicity circulated outside the area from which

the venire is drawn; (6) time elapsed from the release of the publicity until the trial; (7) degree of care exercised in the selection of the jury; (8) ease or difficulty in selecting the jury; (9) veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; (10) defendant's utilization of his peremptory challenges; (11) defendant's utilization of challenges for cause; (12) participation by police or by prosecution in the release of publicity; (13) severity of the offense charged; (14) absence or presence of threats, demonstrations or other hostility against the defendant; (15) size of the area from which the venire is drawn; (16) affidavits, hearsay or opinion testimony of witnesses; and (17) nature of the verdict returned by the trial jury. See State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979).

In the instant case, we are not persuaded that there was "undue excitement" such that the trial court's denial of a change of venue was an abuse of discretion. At the outset, we note that Appellant has failed to establish that "the jurors who actually sat were biased and/or prejudiced." See Mann, 959 S.W.2d at 532 (quotation marks omitted). Moreover, he did not challenge any jurors for cause or exhaust his peremptory strikes. See Thacker, 164 S.W.3d at 238.

Regardless, we are not persuaded that a venue change was necessary. At the close of jury selection, the trial court issued a written order stating:

> The jury was selected on May 12, 2008, without difficulty.
>
> The trial judge had asked the jurors whether they had heard any inflammatory publicity which they could not set aside. Every prospective juror who indicated they could not base their decision only on the evidence presented at trial was excused. During voir dire each juror was questioned individually was to whether that juror could set aside anything learned about the case through publicity. The jurors stated that they could render a verdict based solely on the evidence presented at trial[.] All the prospective jurors who eventually heard the case indicated they could be fair and render an impartial verdict.
>
> The State did not excuse any prospective jurors. The defendant used four peremptory challenges. The jury was accepted without difficulty.

We see no reason to dispute the court's evaluation of the jury selection process. We thus conclude that Appellant has failed to meet his burden of demonstrating "that the jurors who actually sat were biased and/or prejudiced." Mann, 959 S.W.2d at 532 (quotation marks omitted). And as a result, we cannot conclude the trial court abused its discretion in denying Appellant's motion to change venue. See Crenshaw, 64 S.W.3d at 386.

-13-

Our analysis of the <u>Hoover</u> factors buttresses our conclusion. Although there was a large amount of pre-trial publicity about the case, Appellant has pointed to only one report—a transcript of Appellant's inadmissible confession in juvenile court—that is particularly troubling. However, the trial court took great care in selecting the jury and was able to do so with relatively little difficulty. While virtually all of the veniremen were familiar with the publicity generally, only a few indicated that they had acquired information about the case from non-media sources, and they were all excused. Moreover, those who indicated that they could not set aside what they already knew about the case were dismissed by the court. Indeed, Appellant did not challenge any juror for cause, and, as we have noted, he did not exhaust his peremptory challenges. In addition, although the charge was very severe, aside from blog posts and a demonstration that took place outside the courthouse during sentencing, there is little evidence of hostility to Appellant. In sum, these factors do not suggest the trial court abused its discretion in denying Appellant's motion.

Furthermore, although we agree that many of the jurors had been exposed to facts about the case, that alone is not enough to taint the trial. While Appellant suggests that some of the jurors may have been exposed to inadmissible information and inflammatory commentary, "[m]ere speculation that some of the jurors may have been exposed to pretrial publicity does not warrant a new trial." <u>Rogers</u>, 188 S.W.3d at 622. Moreover, each of the jurors vowed they could set that information aside, and nothing Appellant has pointed to causes us to question the trial court's conclusion that the jury could render a fair and impartial verdict. We are similarly unpersuaded by the notion that the jury pool was somehow poisoned by including jurors who had recently sat on other cases being tried by the State's prosecutors. Counsel never probed any of the jurors regarding their perception of the prosecutors or their ability to render a verdict against the State. In short, Appellant has failed to demonstrate that this issue merits reversal. <u>See</u> <u>Mann</u>, 959 S.W.2d at 531-32.

## 2. Jury Questionnaire

Appellant next contends that the trial court erred in failing to utilize his proffered 22-page questionnaire. Appellant cites no authority for the proposition that he is entitled to the jury questionnaire of his choice. Moreover, many of the general topics covered by Appellant's questionnaire were covered either by the court's questionnaire or by questions during voir dire, as were many of the specific questions related to the case. Other questions, such as "Do you think you know a great deal about the law?"; "Have you ever had the authority to hire, fire or promote employees?"; or "Name your three favorite books?" appear to be utterly irrelevant. And still other questions—in particular, the "Personal Opinions" section where jurors were asked to state whether they agreed with twenty-nine statements such as "Our society would be stronger if the crimes were punished more often," and "People often get convicted for crimes they did not commit"—while probably a treasure trove for a

litigator, are not necessary and are perhaps even inappropriate for voir dire. See, e.g., State v. Suttles, 30 S.W.3d 252, 270 (Tenn. 2000).

Appellant argues that his questionnaire was necessary to offset the effects of pre-trial publicity. As discussed above, we do not think the pre-trial publicity tainted the jury in this case. Even if it did, we are not persuaded that the trial court abused its discretion in choosing not to give the litigators extra insights into the personalities of the veniremen. The trial court's jury selection methodology was proper. It need not have utilized Appellant's questionnaire.

### 3. Individual and Sequestered Voir Dire

Appellant contends the trial court erred in denying individual and sequestered voir dire of the veniremen. One of the goals of voir dire is to exclude jurors who have been exposed to potentially prejudicial material that they will not be able to disregard. See Tenn. R. Crim. P. 24(c)(2)(B). Ordinarily, jurors are questioned in voir dire collectively. See Hugueley, 185 S.W.3d at 390. But "[w]here the crime is highly publicized, the better procedure is to grant the defendant[] individual, sequestered[] voir dire." Howell, 868 S.W.2d at 247. Nevertheless, "[i]ndividual voir dire is *mandated only* when there is a significant possibility that a juror has been exposed to potentially prejudicial material." Hugueley, 185 S.W.3d at 390 (emphasis added; quotation marks omitted). As noted above, prospective jurors are not disqualified simply because they already have some knowledge of the case. See id. at 390. "The real question in determining a juror's acceptability is whether his exposure is to matters 'not so prejudicial as to create a substantial risk that his or her judgment will be affected.'" Id. (quoting Tenn. R. Crim. P. 24(b)(2)). "The decision regarding the individual voir dire of prospective jurors remains within the sound discretion of the court, and will not be reversed on appeal absent a finding of manifest error." Id. (quotation marks omitted). The rule in this state is that "if no prejudicial information is elicited during voir dire, and if the jurors assert they can disregard pretrial publicity, there is no error in denying individual voir dire." Id. at 391 (citing State v. Porterfield, 746 S.W.2d 441, 446 (Tenn. 1988)). Moreover, while "questions about the content of the publicity to which jurors have been exposed might be helpful in assessing whether a juror is impartial," those questions "are not constitutionally compelled, and the trial court's failure to ask [them] is not reversible error unless it rendered the defendant's trial fundamentally unfair." Howell, 868 S.W.2d at 247. Furthermore, "the failure to challenge for cause or . . . use any available peremptory challenge to remove objectionable jurors precludes reliance upon the alleged disqualifications of jurors on appeal." Thacker, 164 S.W.3d at 238; see also Sommerville v. State, 521 S.W.2d 792, 797 (Tenn. 1975).

In this case, none of the jurors who served on the jury indicated they had any access to information about the case from any source other than the media. Of the prospective jurors who indicated they had information about the case from another source, all but one was dismissed for cause. The remaining prospective juror testified that her husband was on the scene as a volunteer firefighter. The State said that it would support sequestered questioning of the juror, but Appellant's counsel declined, saying he could get the information he needed without sequestration. The juror was eventually excused with a peremptory strike. No other prospective juror was singled out by the State or Appellant for sequestered questioning. The issue here is not that the trial court denied a request for individual and sequestered voir dire of a particular juror.

Instead, Appellant's argument is that collective questioning forced him to limit his inquiries regarding the content of the media reports to which prospective jurors had been exposed because their responses might convey improper information to an otherwise untainted juror. Appellant was particularly concerned about prospective jurors who had been exposed to the single media report that contained a transcript of Appellant's inadmissible juvenile court confession. Again, the constitution does not compel courts to question veniremen about the content of the media reports they have seen. See Howell, 868 S.W.2d at 247. The single report from one outlet was buried in the pre-trial publicity. We thus conclude that this situation does not present the type of "significant possibility that a juror has been exposed to potentially prejudicial material" that mandates individual, sequestered voir dire. See Hugueley, 185 S.W.3d at 390 (quotation marks omitted). Therefore, we conclude Appellant has failed to demonstrate that the trial court abused its discretion in denying sequestered voir dire here.

### C. Sufficiency of the Evidence

Finally, we turn to Appellant's sufficiency argument. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is

initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Appellant correctly notes that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004). As our supreme court has explained:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)) (brackets omitted), superseded by statute on other grounds as stated in Odom, 137 S.W.3d at 580-81. But, "[w]hether sufficient corroboration exists is a determination for the jury." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

There was more than adequate evidence to corroborate Mr. Garcia's testimony against Appellant. The evidence against Appellant from a variety of sources—including fact witnesses, expert witnesses, and the physical evidence—corroborated Mr. Garcia's testimony and also independently pointed to Appellant's guilt. Appellant's argument, however, is confined to whether there was sufficient corroboration for Mr. Garcia's testimony regarding premeditation. That is not necessary because, as noted above, our case law does not require corroboration for every element of the crime. See Bigbee, 885 S.W.2d at 803. Rather, all that is necessary is that there be "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated." Id. Such independent facts are present in this case, so the jury could reasonably conclude Mr. Garcia's testimony was sufficiently corroborated.

Moreover, we are not persuaded that Mr. Garcia's testimony that Appellant said he might have to "do a cop" is the only evidence of premeditation in the case. A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill; evidence of the procurement of a weapon; the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; preparations before the killing for the purpose of concealing the crime; and calmness immediately after the killing. Id. In this case, there was evidence that Appellant acquired a gun prior to the killing. Although the evidence is that he did so "for protection," the jury could reasonably infer that killing the victim was the type of "protection" Appellant had in mind. In addition, both Appellant's decisions to dispose of the evidence and call for a ride to escape to Nashville indicate calmness after the killing. Although Mr. Garcia testified that Appellant was "freaking out," Mr. Pringle testified that when he saw Appellant, he behaved normally. Lastly, and most powerfully, the video of the crime demonstrates that Appellant had time to reflect on whether or not he wanted to kill the victim. The victim calmly approached the car and asked Mr. Garcia questions. He then asked him to step out of the vehicle and asked him more questions. When the victim returned to the driver's side door, he calmly took off his hat, placed it on top of the car, and leaned in. The audio and video do not reflect that there was a struggle between Appellant and the victim, nor does it suggest Appellant scrambled to get the gun just prior to firing. Instead, it suggests Appellant had the gun in hand, and he just simply shot the victim as the victim leaned into the vehicle. In short, the video makes clear that the manner and circumstances surrounding the killing gave Appellant plenty of time to reflect on his options. It is thus evidence that Appellant formed the intent to kill the victim prior to doing so. Therefore, giving the State the benefit of all reasonable inferences, see Cabbage, 571 S.W.2d at 835, we conclude that there was sufficient evidence to corroborate Mr. Garcia's testimony that Appellant told him he might have to "do a cop." Indeed, the evidence was sufficient for the jury to find premeditation without Mr. Garcia's testimony.

## III.  Conclusion

For the foregoing reasons, after thorough review, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE