IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 16, 2014

**WILLIAM A. OSBORNE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sumner County**
**No. 277-2013      Dee David Gay, Judge**

**No. M2014-00458-CCA-R3-PC - Filed February 26, 2015**

A Sumner County jury convicted the Petitioner, William A. Osborne, of three counts of facilitation of aggravated burglary, one count of facilitation of theft of property valued more than $500, one count of theft of property valued between $1,000 and $10,000, and one count of theft of property valued between $500 and $1,000. The trial court sentenced him as a career offender and ordered the Petitioner to serve an effective sentence of thirty-six years. The Petitioner appealed, and this Court affirmed the judgments of the trial court. *State v. William A. Osborne*, No. M2010-02412-CCA-R3-CD, 2012 WL 1243243, at *1 (Tenn. Crim. App., at Nashville, Apr. 5, 2012), *perm. app. denied* (Tenn. Aug. 17, 2012). The Petitioner subsequently filed a petition for post-conviction relief, in which he alleged that his trial counsel was ineffective on multiple grounds. The post-conviction court dismissed the petition after a hearing. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Jon J. Tucci, Nashville, Tennessee, for the appellant, William A. Osborne.

Herbert H. Slatery, III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Lawrence Ray Whitley, District Attorney General; Lytle A. James, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Facts
## A. Trial

This case arises from the Petitioner's burglary of the home of the victim, Lauren Stewart, in Sumner County, Tennessee. On direct appeal, this Court summarized the underlying facts of the case as follows:

Lauren Stewart testified that her home was burglarized on March 4, 2009. Ms. Stewart recalled that, on this day, she went to work in downtown Nashville, and, at about 10:00 a.m., she received a phone call from her uncle, Dewayne Sircy, who lived approximately a half a mile behind her house. Ms. Stewart's uncle notified her that her home had been burglarized. Ms. Stewart left work and drove home where police officers were already investigating the burglary. The front door of the house was "busted open," and the entire living room was in disarray. Ms. Stewart described her living room as "shocking," saying, "It looked like something out of a movie, like when you see someone's house ransacked in a movie." In Ms. Stewart's bedroom, the bed mattress was flipped over and the contents of her dresser drawers were dumped on the floor.

Ms. Stewart testified that her DVD collection, CDs, DVD player, two laptop computers, her digital camera, and jewelry were stolen. She estimated that eighty DVDs were stolen for which she paid an average of $10 each. She testified that her Apple laptop computer was worth $1900, and she had purchased about $1000 worth of graphic design software programs for school that were downloaded onto the computer. Ms. Stewart testified that her other laptop computer was "older" and purchased for "around [$]2000," but she estimated the worth of an equivalent laptop now at $850 to $1000. Ms. Stewart valued the digital camera at $300 and the total value of the jewelry stolen at $2000. In addition, Ms. Stewart said that a bottle of washing detergent, Clorox, and two cases of Coke were stolen from her home that day.

Ms. Stewart testified that, several days later, she received a phone call regarding her missing items. She drove to Franklin, Kentucky, and was able to identify some of the items stolen from her home. Ms. Stewart testified that the aggregate value of the property stolen was over $500.

Dewayne Sircy, Lauren Stewart's uncle, testified that he lived about 1400 feet directly behind Ms. Stewart's home. On March 4, 2009, he was upstairs in his home when he heard his dog barking. He looked out the window and saw a car parked in Stewart's driveway. He continued to watch

2

as three individuals got out of the car and walked to the back of Stewart's house. One of the individuals went to the door while the other two went to windows. Sircy thought this was odd, so he decided to go to Stewart's to see if she was having work done to her house. It was early in the morning, so Sircy dressed, went outside, and got in his car. As he started down the driveway, he saw the car leaving Stewart's house.

Mitchell Curry testified that his home had been burglarized on March 2, 2009. He recalled that, on that day, he had returned home from work when he noticed the front door was open. He assumed his roommate had left the door ajar, so Curry went inside. Once inside, he saw that his computer was missing, so he began going from room to room in the trailer. He described the rooms as "ransacked, drawers thrown everywhere, cabinets ripped out, clothes, bed sheets ripped off the beds, beds tossed in the floor." Curry said that he owned three guns that he kept in a locked gun cabinet in his bedroom closet. He found the gun cabinet lying on his bed, pried open, with the three guns missing. The replacement cost of the gun cabinet was $150, and he estimated a $900 total value for the three stolen guns: a Remington 870 shotgun, a Marlin 336 rifle, and a Glock 22 pistol. Ammunition and a gun cleaning kit, worth $60 in total, were also taken during the burglary. Curry estimated the value of his laptop computer at $800. Curry agreed that the aggregate value of the property stolen was "easily over $1000." Curry denied giving anyone permission to enter his house or take any of the missing items.

James Jones, Matthew Curry's roommate, testified that he owned a .22 rifle, a 16-gauge shotgun, a knife case with multiple knives, a circular saw, and a class ring, all of which were stolen during the burglary. He estimated that the guns were worth $150 each, the class ring between $250 and $300, and the circular saw about $60. He could not place a value on the knives because he had been collecting them for "several years." Jones said that he recovered some of the items from the Franklin Police Department. Jones testified that he did not give anyone permission to enter the trailer or take any of the missing items.

Josephine Shuler testified that, when she and her husband entered their home after returning from lunch with their son, she noticed a drawer from a washstand that sits near the back door was set on the floor. When her husband denied any knowledge of moving the drawer, Ms. Shuler called the police, believing they had "been robbed." She followed her husband upstairs to the bedrooms and found two of the bedrooms in complete disarray. She recalled

3

that the rooms "looked like a hurricane had hit [them]." Drawers were pulled out of the dressers and dumped on the floor, mattresses thrown off the beds, and houseplants dumped on the floor. The master bedroom appeared undisturbed except for the dresser drawers which were opened. Ms. Shuler testified that approximately $3500 worth of her jewelry and some pistol and shotgun shells were missing. She identified and recovered some of the items from the Franklin Police Department. Ms. Shuler denied giving anyone permission to enter her home or take her jewelry and the gun ammunition.

Ivan Pyne, an Academy Sports store manager, testified that he provided police with video surveillance footage that depicted the [Petitioner], on March 3, 2009, purchasing a box of 40 Smith & Wesson 180-grade ammunition from the gun counter at the Rivergate Academy Sports store.

Nathan Oakes, an associate at Berry's Jewelry & Loan in Madison, Tennessee, provided transaction documents for March 4 and 5, 2009. The documents showed that Timothy Peden, a co-defendant in this case, pawned four jewelry items and eighty-three DVD movies. Oakes explained that, subsequently, these items were placed on hold and confiscated by the police.

Timothy Peden testified that he was prepared to participate in the trial as a co-defendant, but he had changed his mind and entered into an agreement with the State as to the disposition of the charges against him. The agreement required that Peden "tell the truth" in exchange for a fifteen-year sentence to be served at 60%. Peden admitted that he lied to police during previous interviews. Peden agreed that he had a "very long" criminal history including numerous aggravated burglaries and theft convictions. Peden agreed that he had additional outstanding warrants for burglaries in other counties.

As to the general approach taken to the burglaries, Peden explained that he, the [Petitioner], and Biggs would find a "suitable home" where there were no cars in the driveway. Someone would knock on the door and if no one answered, they would "bang" on the back door and windows. If still no one answered, the group would "kick in" or pry open the door. Once inside, they would move quickly, ransacking the house to find valuable items, put those items in a bag, and leave. After burglarizing the home, Peden said that they would split up the stolen items. At the time of these burglaries, Peden was actively using cocaine, and he would sell his items to drug dealers in exchange for cocaine.

4

Peden testified that the three homes burglarized were all located in Sumner county. After burglarizing a home, they took the stolen items to Franklin, Kentucky, where the [Petitioner] and Biggs lived. Peden said that he went to the Kentucky house on two occasions. While there, he said they would drink beer, he would smoke crack cocaine, and the group would sift through the stolen items to determine what was of value.

Peden testified that on March 2, 2009, he, the [Petitioner], and Biggs burglarized a trailer in Sumner County. Peden recalled that they found a gunsafe in one of the bedrooms. He said that they laid the gunsafe on the bed and broke it open to reveal a .40 caliber gun, rifles, and a gold class ring. While opening the safe, a shelf fell and hit Peden in the face leaving a cut. Peden said that he put a T-shirt on the wound to keep any blood, which might be traceable, from falling onto the floor. Peden said that he did not wear gloves during that burglary but that the [Petitioner] and Biggs wore gloves.

Peden testified that on March 3, 2009, he, the [Petitioner], and Biggs went to an Academy Sports store. The State played surveillance video footage from the store, and Peden identified Biggs, the [Petitioner], and himself. Peden also identified the [Petitioner] as the person buying ammunition for the .40 caliber gun stolen from the trailer at the checkout counter of the store.

Peden testified that on March 4, 2009, he, the [Petitioner] and Biggs burglarized two more homes. He could not recall in which order they burglarized the homes but described finding a home with no car in front. He said they ran around the back, knocked on the door, and, when no one answered, they entered the unlocked back door. Peden said that they found what they assumed to be gold jewelry in a black case, but later learned that it was "fake."

After learning the jewelry was not real, they threw it away because it was worthless. The other burglary was of Stewart's home. Peden recalled that he "stole a bunch of gold and went and pawned" it that same day. Peden said that they also stole laptop computers, jewelry, and numerous DVDs. On the following day, he took the stolen DVDs to the same pawn shop where he had taken the jewelry. Peden identified his signature on the bottom of a pawn ticket.

Brandy Biggs, a co-defendant in this case, testified that she lived in Nashville. At the time of the [Petitioner's] trial, Biggs had already pled guilty

for her role in these crimes and received an eight-year sentence to be served on community corrections. As a condition of her plea agreement with the State, Biggs agreed to testify truthfully against her co-defendants. Biggs agreed that her criminal record consisted of shoplifting, assault, and simple possession misdemeanor convictions.

Biggs identified the [Petitioner] in the courtroom and testified that she and the [Petitioner] were involved in a romantic relationship for "about five years." Biggs said that, in March 2009, she, the [Petitioner], and Peden burglarized three homes in Sumner County. On March 2, they burglarized a trailer where they found a gun safe. Biggs said that the [Petitioner] and Peden forced open the gunsafe and found shotguns and pistols, which they took from the trailer. Biggs recalled that while attempting to open the gunsafe, Peden cut his eye. Biggs said they took items from the trailer, including the guns, and went to her home and then to Nashville to try to sell the stolen items.

Biggs testified that, on the following day, she, the [Petitioner], and Biggs went to an Academy Sports store where the [Petitioner] bought ammunition for one of the stolen guns. The State played the surveillance video footage for March 2, 2009, and Biggs identified herself, the [Petitioner], and Peden at the Academy Sports store in the footage.

Biggs testified that on March 4, 2009, she, the [Petitioner], and Biggs went to a brick house where they stole an Apple computer, a laptop computer, DVDs, and jewelry. Biggs could not recall if they stole laundry detergent from this particular home but testified that they did steal laundry detergent from one of the homes they burglarized. After leaving this house, they went to "the house in Kentucky, like what we did always," sorted through the stolen items, and then drove to a pawn shop in Nashville. The Apple laptop was sold but Biggs was uncertain to whom. She explained that the [Petitioner] "was the one doing the dealings on the computer." Biggs recalled that they stole jewelry at the other home they burglarized that day and later pawned it.

Biggs testified that she leased the house in Kentucky, where she and the [Petitioner] lived. Biggs said that she had a job with a temp service, but, after being fired, she worked at a Shoney's restaurant in Bowling Green, Kentucky. The [Petitioner] would drive [her] to and from her work. Biggs said that she bought the Honda, which the police had subsequently searched, from one of the [Petitioner's] acquaintances for $1000. Biggs gave the [Petitioner] the money, and the [Petitioner] purchased the car for her. She was unable to put

6

her name on the title of the car because the [Petitioner] kept the title with him. Biggs said that she drove the car "randomly," "maybe once or twice" to work.

Ben Brown, a Franklin City Police Department officer, testified that, on March 7, 2009, he was patrolling the area of Harristown, a high crime area, with a trainee. While on patrol, he observed a vehicle backing into a driveway with the headlights on. The police officers believed the residence next door to that driveway was vacant. Officer Brown said that in this particular location there was a row of three houses that were "frequently vacant." After the vehicle pulled into the driveway, the driver turned the headlights off and stepped out of the vehicle. Officer Brown said that they were driving down the street toward the [Petitioner], and, when he turned and looked at the police car, the [Petitioner] was "visibly startled." The [Petitioner] then immediately turned around and walked quickly into the shadows and out of sight, behind the blue Honda and the row of houses.

Officer Brown testified that they drove around the block trying to locate the [Petitioner]. Unable to find him, they returned to the location of the blue Honda. Officer Brown said that when he approached the driver side, where he initially saw the [Petitioner], he smelled the strong odor of marijuana. He noted that the windows of the car were "cracked" open. Officer Brown said they searched the area looking for the [Petitioner] but again were unable to find him. They returned to the vehicle and checked the vehicle registration. The license tag on the vehicle, 705 TMB, returned as a 1994 blue Buick registered to the [Petitioner]. Based upon this information, the officers began investigating the potential of a stolen vehicle. The officers located the VIN for the car which indicated the car was a 1994 red Honda registered under the name of Sean E. Bass.

On cross-examination, Officer Brown clarified that the VIN on the car had expired and not the registration for the license plate as he had testified at the suppression hearing.

Carolyn Templeton, Chief Deputy for the Sumner County Clerk's office, identified an application for title submitted by [the Petitioner] in September 2008. The license plate number was 705 TMB and the vehicle was a 1994 Buick. The expiration date for the vehicle tag was September 30, 2009.

Chris Tarlecky, a Sumner County Sheriff's office detective, testified that he located an Academy Sports store receipt inside the blue Honda.

7

Detective Tarlecky also assisted in the execution of the search warrant for Biggs' residence in Kentucky. After Franklin police cleared the house for safety, Detective Tarlecky found four or five trash bags on the kitchen floor. Inside he found ammunition, jewelry, jewelry boxes, coins, and "regular household trash." At the Franklin Police Department, Detective Tarlecky matched several items to makes and models of items reported stolen in Sumner County. In total, Detective Tarlecky recovered four or five guns from Franklin, Kentucky, that were reported stolen in Sumner County.

On cross-examination, Detective Tarlecky testified that he was present during the police interview of Biggs. He said that, initially, Biggs was not forthcoming and denied knowledge of the burglaries. After about fifteen or twenty minutes, Biggs began providing information about the burglaries.

Kevin Williams testified that at the time of these events he worked for the Portland Police Department. Officer Williams said that he and Biggs drove to the Shuler residence, and Biggs described the events of the burglary to him. Later, Officer Williams recovered some of the Shulers' property at the police department in Franklin, Kentucky.

Tim Bailey, a Sumner County police detective, testified that he investigated the burglary of Ms. Stewart's home. Upon arriving at Ms. Stewart's home he observed that the front door had been forced open. Police officers processed the scene and obtained fingerprints, which were sent for analysis. The fingerprints returned as matching Ms. Stewart's fingerprints.

In the course of his investigation, Detective Bailey met and spoke with Biggs. The interview began with Biggs minimizing her knowledge or role in the burglaries, but Biggs eventually told Detective Bailey about her involvement in the burglaries. After the interview, Biggs agreed to show police officers the houses she, the [Petitioner], and Peden burglarized. Detective Bailey also spoke with Peden. Peden also minimized his knowledge and role in the burglaries but ultimately confessed to the burglary of Ms. Stewart's home. Detective Bailey met with the [Petitioner], but the [Petitioner] refused to give any statement to police about the burglaries.

*Osborne*, 2012 WL 1243243, at *2-7 (footnote omitted). The jury convicted the Petitioner of three counts of facilitation of aggravated burglary, one count of facilitation of theft of property between $500 and $1,000, one count of theft of property between $500 and $1,000, and one count of theft of property between $1,000 and $10,000. The trial court sentenced

the Petitioner as a career offender to an effective sentence of thirty-six years to be served at 60%. *Osborne*, 2012 WL 1243243, at *7-8.

## B. Post-Conviction Hearing

The Petitioner filed a petition, *pro se*, for post-conviction relief, claiming that he received the ineffective assistance of counsel because his trial counsel, ("Counsel"): (1) failed to file a motion to sever his trial from his co-defendant's; (2) allowed "illegal evidence" to be admitted during his trial; (3) failed to request a psychiatric evaluation of the Petitioner; (4) failed to object to the trial court's instructions given to the jury during its deliberation; (5) failed to present certain facts on direct appeal; and (6) failed to object to the State's "malic[ious]" and false statements during closing arguments. The Petitioner asserted additional arguments in his petition that he does not maintain on appeal. The post-conviction court held an evidentiary hearing, where the parties presented the following evidence:

Counsel testified that he represented the Petitioner during his jury trial. Counsel stated that there were "tons" of pretrial negotiations in the Petitioner's case, during which Counsel advised the Petitioner "orally and in writing" the "specific pros and cons of accepting a guilty plea." Counsel stated that it was the Petitioner's decision to proceed to trial. Counsel agreed that the Petitioner reported he had "some mental issues," and Counsel raised those issues during the Petitioner's sentencing hearing. Counsel stated that he "considered" having a mental health evaluation of the Petitioner, but he ultimately decided not to seek an evaluation. Counsel stated:

> . . . [T]he reason why is because, . . . [the Petitioner] was wanting . . . a speedy trial. And I told him it would really take some time to [have a mental health evaluation]. But, more importantly, [the Petitioner] seemed cognizant to me. I mean, he knew the procedures, knew the system pretty well, knew what parole was, the percentages, and the elements of the crime pretty well. So I didn't ever feel like I was talking to just a blank space.

Counsel testified that he reviewed the discovery and evidence with the Petitioner, both in person and by mail. Counsel recalled taking his computer to the Petitioner in prison and letting him listen to the audio evidence. The Petitioner was aware of the evidence the State planned to introduce at trial. The Petitioner asked Counsel to specifically interview one of the State's witnesses, Shawn Bass, and Counsel interviewed him before trial. Counsel and the Petitioner discussed calling Mr. Bass to testify on behalf of the Petitioner, but a "tactical, strategic" decision was made not to call Mr. Bass. Counsel stated that he thought it was a joint decision not to call Mr. Bass to testify. Counsel did not recall the Petitioner asking him to interview his landlord in Kentucky.

9

Counsel testified that the Petitioner told him of his romantic relationship with Ms. Biggs and explained their involvement together in several crimes. Counsel was aware of other pending criminal cases involving the Petitioner and Ms. Biggs when he questioned Ms. Biggs on cross-examination. Counsel agreed that he asked Ms. Biggs a question which "unfortunately" lead to her testifying about the Petitioner's other crimes that the trial court had previously ruled inadmissible. Ms. Biggs also stated that the Petitioner "had warrants on him in Davidson County." Counsel testified that, throughout her testimony, Ms. Biggs would give extended answers with "tid bit[s]" that referred to the Petitioner's current and past criminal record. Counsel agreed that he failed to object to a question asked of Ms. Biggs by the trial court in reference to a crime committed in Kentucky.

Counsel agreed that at some point there was a discussion that the jury "was hung" as to the first count in the indictment. Counsel stated that the trial court brought the jury into the courtroom and asked the jury foreman about whether the jury was hung. The trial court instructed the jury to continue to deliberate on the remaining six counts in the indictment, and ultimately the jury returned a verdict on all of the counts. Counsel stated that "it was a mistake not to have objected to" the jury "being previously hung as to Count One but yet returning a verdict as to Count One[.]" Counsel stated: "My thinking was that [the trial court] did give fairly . . . descriptive instructions as to [what to do about being hung on count one], but I definitely should have objected to it, if, for no other reason, so that [the Petitioner] would have that issue preserved [on appeal.]"

On cross-examination, Counsel reiterated that it was a mistake not to object to the trial court's instructions to the jury, but agreed that it was not an error that the trial court let the jury reconsider its verdict as to count one after originally reporting being hung. Counsel testified that there was no reason to call the landlord who owned the Kentucky residence about whose name was listed on the lease because Ms. Biggs had testified that it was her name on the lease. Counsel also stated that he had no control over Ms. Biggs and her testimony about the Petitioner's criminal history and that he chose not to object to her answers so as not to call further attention to those negative facts.

Counsel testified that he had lengthy discussions with the Petitioner about the various plea agreements offered by the State, and the Petitioner rejected all of the State's offers. They also discussed the co-defendant's decision to plead guilty immediately before trial, and the Petitioner knew that the co-defendant would testify against him in return for his plea deal. Despite that, the Petitioner did not want to accept the State's offers. The Petitioner never indicated to Counsel that he had could not understand his legal situation, and Counsel stated that the Petitioner was cognizant of what was occurring.

Counsel testified that he became a licensed attorney in 2004 and that the majority of

10

his practice was criminal law. He went over "every bit" of discovery with the Petitioner and formulated a defense theory that the Petitioner's co-defendants had "turn[ed] the table" against him to get better plea deals for themselves. Counsel agreed that his main strategy was to attack the credibility of the co-defendants. He also agreed that the jury returned convictions to lesser-included offenses on all three burglary charges. Counsel said he "felt bad" after the Petitioner was convicted, but that the Petitioner did not have any complaints about Counsel's representation.

Based upon this testimony, the post-conviction court denied post-conviction relief. The post-conviction court made the following ruling from the bench:

> The [Petitioner] was indicted in January of 2010 for the counts that were later tried on [sic] May 2010. And as [the Assistant District Attorney General] indicated, this was an IAD case that time was of the essence in disposition. [Counsel] was appointed to represent this [Petitioner] after the public defender's office was appointed and had a conflict.
>
> [Counsel] testified that he was licensed in 2004. And up until the time of this trial, in May 2010, he practiced and the majority of his practice [was] in criminal law.
>
> [Counsel] stated . . . [that] he received discovery, he went over the discovery with the [Petitioner], had numerous discussions preceding trial. [Counsel] went over the discovery in person and by letter. And on one occasion he brought a computer down to the jail and spent the night here listening to evidence to be used in the trial.
>
> There was no problem with [the Petitioner's] competency. He wanted a speedy trial. He understood and was cognizant of everything. He had a determined purpose in what he wanted accomplished.
>
> It's clear he rejected a pretty good offer. The offer was communicated. From 15 years at 60 percent consecutive to 12 at 60 concurrent is a pretty good way to travel for a defense attorney in negotiations, especially in light of the fact that the [Petitioner] ended up being sentenced to 36 years at 60 percent consecutive.
>
> Further, [Counsel] filed a motion to suppress. He argued a motion to consolidate. He argued a motion in limine that's been discussed here.

11

And I think the Court of Appeals brought this out. There is no control over the answers a person gives in a trial. And those of us that have tried cases are very much aware of that. No matter what we do sometimes to tell witnesses to stay away in certain areas, it still happens, and that happened in this case. As the [Assistant District Attorney] General indicated, you don't want to go over too much to bring out the point, and [Counsel] did object to it and there were curative instructions given to the jury based on that objection.

Also, . . . he represented [the Petitioner] in the jury trial lasting over two days, sentencing hearing, did a motion for new trial and judgment of acquittal.

The jury did come back with lesser included offenses. Instead of 15 years at 60 percent as a possible option, the Court was required to go to a lesser range, 12 years at 60 percent was the most, as opposed to 15 at 60. So because of that and the jury verdict, lesser sentences were possible because of representation at the jury trial indicated by the fact that the jury came back with lesser included verdicts on the three aggravated burglary charges.

Also, in looking at the hung jury, [Counsel] testified about that and I think the record is pretty clear that nobody knew what was going on, what the jury had done. They were advised to go back to deliberate, and they were told not to do anything but consider the other counts, and I think that is reasonable. I don't know what else an attorney could do there. Looking at it from his standpoint, you might think, well, if they're hung up on one, they might be hung up on others. You never know. So that is the context of the evidence that has been presented to me in considering the ineffective assistance of counsel issue.

. . . .

So in analyzing the testimony here, the record, the law, and *Strickland* and in *Felts*, I find that [Counsel] provided effective assistance of counsel in this case. And I further find that he did a good, admirable job. He was responsible for a jury verdict of lesser included charges on three of the charges which lessened [the Petitioner's] liability considerably. He pursued those avenues that he felt necessary to pursue. He spent as much time as one can spend with a defendant in preparing for trial, especially in sitting with him in the jail and going over evidence and reviewing evidence together.

The motions, the trial strategy, the trial work, the trial representation,

12

the representation at sentencing, and the motion for new trial were all adequate and sufficient under the law. Again, I find that [Counsel] did a good job in representing [the Petitioner].

I find specifically that there is no Sixth Amendment violation, that there is no ineffective assistance of counsel here and, because of that, it is not further necessary to determine any prejudice. And that will be the order of the Court.

It is from this judgment that the Petitioner now appeals. The post-conviction court appointed counsel to represent the Petitioner in this appeal.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it failed to find that Counsel was ineffective. The Petitioner contends that Counsel's errors were not the result of trial strategy but rather, "egregious execution of that strategy." The Petitioner contends that Counsel made the following "errors": (1) failure to request an instruction limiting Ms. Biggs's testimony about the Petitioner's criminal history or his pending charges; (2) improper cross-examination of Ms. Biggs, and failure to object to her improper testimony; (3) failure to object to the trial court's instruction to the jury; and (4) "acts of omission" during sentencing and when filing the Notice of Appeal. The State responds that the Petitioner has failed to prove that Counsel's cross-examination of Ms. Biggs constituted ineffective assistance of counsel. The State further contends that the Petitioner has not proven that Counsel's decision not to object the trial court's instructions to the jury or his representation at sentencing constituted ineffective assistance of counsel.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to

13

a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462.

Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d

14

793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### A. Ms. Biggs's Testimony

The Petitioner contends that Counsel was deficient in his representation throughout Ms. Biggs's testimony. The Petitioner alleges that Counsel should have requested that the trial court instruct Ms. Biggs not to testify about the Petitioner's criminal history or present charges, which the trial court had deemed inadmissible. He alleges that Counsel improperly cross-examined Ms. Biggs and asked "open-ended" questions that lead to inadmissible testimony. Further, the Petitioner contends that Counsel was ineffective for failing to object to Ms. Biggs's improper testimony and for failing to request a curative instruction.

This court has previously noted that the method by which a witness is examined is a "strategic and tactical decision of trial counsel which is not to be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). "[I]n reviewing counsel's conduct, a 'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing *Strickland* 466 U.S. at 689, and *Hellard*, 629 S.W.2d at 9 (stating that "counsel's conduct will not be measured by '20-20 hindsight'")).

At the evidentiary hearing, Counsel admitted that, during his examination of Ms.

15

Biggs, she made unfortunate mention of charges that were pending against the Petitioner or other crimes that he had committed. Counsel stated that Ms. Biggs often added additional, unnecessary information throughout her testimony, and he agreed that he did not object to that testimony so as not to call the jury's attention to that testimony.

Viewed in hindsight, Counsel's decisions throughout Ms. Biggs's testimony may have been ill-advised. However, we reiterate that a defendant is not entitled to perfect representation, *Denton*, 945 S.W.2d at 796, and we acknowledge that "counsel must make quick and difficult decisions respecting strategy and tactics that appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill considered." *Hellard*, 629 S.W.2d at 9-10. Thus, it cannot be said that a failed witness examination strategy, as is the case here, rises to the level of incompetent representation.

Even if we were to conclude that Counsel's representation in this regard fell below the constitutional standard, the Petitioner has failed to demonstrate that he was prejudiced by the alleged ineffective representation. The Petitioner has not shown by clear and convincing evidence that Counsel's decisions during the examination of Ms. Biggs effected the outcome of his proceedings. Accordingly, we do not conclude that Counsel's representation fell below an objective standard of reasonableness. Thus, the Petitioner is not entitled to relief.

### B. Jury Instructions

The Petitioner next contends that Counsel's representation was ineffective when he failed to object to the trial court's instructions to the jury regarding its deliberation.[1] The Petitioner further contends that Counsel was ineffective when he failed to raise the issue in the motion for new trial, thus leading this Court to conclude that the issue was waived on direct appeal. The State responds that the issue is waived for failure to include in the record the relevant portion of the trial transcript. The State further alleges that the Petitioner has failed to prove that Counsel's failure to object to the jury instructions constitutes ineffective assistance of counsel because the Petitioner has not shown that had Counsel objected, the Petitioner would have prevailed on direct appeal.

Counsel risks waiver by failing to cite in his brief to the exact portion in the original record of the trial where he says Counsel's alleged deficient conduct occurred. "Failure to cite to any relevant authority in support of his argument and his failure to cite to appropriate

---

[1]To assist in the resolution of this proceeding, we take judicial notice of the appellate record from the Petitioner's prior direct appeal. *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

16

references to the record constitutes waiver. *State v. Leonard*, No. M2006-00136-CCA-R3-CD, 2007 WL 957199, at *6 (Tenn. Crim. App., at Nashville, March 27, 2007) (citing Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b)). However, in the interest of justice, we will address the Petitioner's argument.

At trial, during its deliberation, the jury informed the trial court that it was hung as to Count 1 and asked the trial court how to proceed. The trial court instructed the jury to "[g]o on to the remaining counts and let me know if you can reach a verdict as to the other counts." The jury returned to their deliberations and returned with a verdict as to all counts including Count 1. At the post-conviction hearing, Counsel testified that he should have objected to the trial court's instructions and should have raised the issue in the motion for new trial.

The post-conviction court determined that the trial court's instructions to the jury were "reasonable" and concluded that Counsel was not ineffective for failing to object, based on the reasonableness of the trial court's instructions. The post-conviction court stated "I don't know what else an attorney could do [in that situation]." We conclude that the post-conviction court did not err when it found that the Petitioner was not entitled to relief on this basis. A trial judge has the authority to give supplemental instructions in response to a question propounded by the jury. *State v. Moore*, 751 S.W.2d 464, 467 (Tenn. Crim. App. 1988) (citing *Leach v. State*, 552 S.W.2d 407, 408 (Tenn. Crim. App. 1977); *State v. McAfee*, 737 S.W.2d 304, 307 (Tenn. Crim. App. 1987)). Permissible supplemental instructions to a hung jury include an admonishment by the trial court to deliberate further until a unanimous verdict has been reached. *See State v. Crenshaw*, 64 S.W.3d 374, 390 (Tenn. Crim. App. 2001) (citing *Kersey v. State*, 525 S.W.2d 139, 145 (Tenn. 1975)). Thus, in this case, the trial court's instruction to the jury was proper, and, as such, even had Counsel objected to the instruction or raised the issue in the motion for new trial, the Petitioner would not have been granted relief on appeal. The Petitioner has failed to show that he was prejudiced by Counsel's representation and he is not entitled to relief on this issue.

### C. Sentencing

The Petitioner lastly contends that Counsel was ineffective for his failure to "motion the [t]rial [c]ourt for a mental health evaluation" during the sentencing phase. He claims that Counsel was "well aware" of the Petitioner's mental health issues. The State responds that the Petitioner did not present expert mental health testimony at the post-conviction hearing, and that his failure to do so precludes him from relief on this issue. We agree with the State.

Counsel testified that the Petitioner never told him that he had any mental health problems, and there was never any indication that he did not understand "his legal situation." Based on this evidence, the post-conviction court concluded that there was no issue with the

Petitioner's competency and that he understood the proceedings. No other evidence was presented at the post-conviction hearing that the Petitioner had any mental health issues or that there was any reason for a mental health evaluation to be ordered. Failure to present evidence of his mental health issues at post-conviction proceedings means that the Petitioner has not met his burden of proof. *Demario Johnson v. State*, No. W2011-02123-CCA-R3-PC, 2013 WL 772795, at *8 (Tenn. Crim. App., at Jackson, Feb. 27, 2012), *perm. app. denied* (Tenn. July 10, 2013). Accordingly, we hold that the evidence did not preponderate against the post-conviction court's conclusion that Counsel was not ineffective for failing to request a mental health evaluation. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

18